348 F.2d 844
 UNITED STATES of America ex rel. George HETENYI, Relator-Appellant,
v.
Walter H. WILKINS, Warden of Attica State Prison, Attica,
New York,Respondent-Appellee.
 No. 373, Docket 29104.
 United States Court of Appeals Second Circuit.
 Argued March 12, 1965.
Decided July 13, 1965.
 
 Ernest J. Brown, Cambridge, Mass., for relator-appellant.
 Michael H. Rauch, Deputy Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen., of New York, on the brief), (Samuel A. Hirshowitz, First Asst. Atty. Gen., Mortimer Sattler, Asst. Atty. Gen., and Brenda Soloff, Deputy Asst. Atty. Gen., of counsel), for respondent-appellee.
 Before SMITH and MARSHALL, Circuit Judges, and METZNER, District judge.*
 MARSHALL, Circuit Judge.
 
 
 1
 George Hetenyi is presently imprisoned in Attica, New York, by the State of New York under a sentence of from forty years to life that was imposed after a jury found him guilty of murder in the second degree. He applied to the United States District Court for the Western District of New York for a writ of habeas corpus pursuant to 28 U.S.C. 2241, claiming that he is being held in custody in violation of the federal Constitution. The District Court denied his application on the merits, and this is an appeal from that order. We reverse.
 
 
 2
 On or about April 22, 1949 Hetenyi's wife was shot to death. Approximately one month later, on May 19, 1949, Hetenyi was indicted by the Grand Jury of Monroe County, New York, for murder in the first degree, and he was thrice tried on this same indictment.[1] At all three trials the evidence supporting the charge was circumstantial.
 
 
 3
 The first trial took place during December, 1949 in the Monroe County Court. The trial judge gave the jury the alternatives of finding Hetenyi guilty of first degree murder,[2] guilty of second degree murder,[3] guilty of first degree manslaughter[4] or not guilty. The jury returned a verdict of guilty of second degree murder, and in January, 1950 Hetenyi received a sentence of from fifty years to life. He appealed to the Appellate Division, Fourth Department, and that court unanimously reversed the judgment of conviction and granted a new trial. 277 App.Div. 310, 98 N.Y.S.2d 990 (1950). The Appellate Division noted 'that the verdict is supported by sufficient evidence,' yet it found error affecting 'the substantial rights of the defendant' in the charge relating to venue, in the admission of certain evidence, and in certain comments by the District Attorney on some of this evidence. Specifically, reversible error was found in the trial court's refusal to charge the jury, as requested by defendant, 'that they must find as a fact in this case that this killing occurred in the County of Monroe before they can find a conviction,' in the trial court's charge that 'it makes no difference as to where those shots (killing his wife) were fired,' and in charging that finding her body 'within the confines of the County of Monroe, is sufficient as a presumption of law that the shots were fired in the County of Monroe * * *' The Appellate Division also held that the trial judge had committed reversible error by admitting into evidence a leather holster found near the place where the body of the deceased was discovered and by allowing the District Attorney to argue in his summation that the holster belonged to defendant and 'that without question it includes the gun.' There was no direct evidence that this holster was the one claimed to have been seen in Hetenyi's car some months prior or that Hetenyi ever owned a gun. Hetenyi also sought reversal because the prosecution had used an article in a magazine relating to the paraffin nitrate test. At the trial, the subject of the test was brought up by the District Attorney on direct examination of a police officer; on cross-examination, Hetenyi's counsel read from a textbook on the subject; and on re-direct the article from the magazine was read, apparently to contradict the textbook. The Appellate Division concluded that since 'no such test was made of defendant's hands,' 'the whole matter was irrelevant and incompetent' and 'it was error to permit the reading of either the text-book or the article.' It was on the basis of all of these errors, held to affect 'defendant's substantial rights,' that the Appellate Division reversed and ordered a new trial. The State appealed from this reversal but the order of the Appellate Division was unanimously affirmed by the Court of Appeals of New York without opinion. 301 N.Y. 757, 95 N.E.2d 819 (1950).
 
 
 4
 Following this reversal, the same District Attorney proceeded to try Hetenyi for the second time under the same indictment charging first degree murder. The trial took place in April and May of 1951 in the Monroe County Court. The jury returned a verdict of guilty of murder in the first degree and Hetenyi was sentenced to be executed. Hetenyi appealed directly to the Court of Appeals, and a closely-divided court reversed the judgment of conviction and ordered a new trial. 304 N.Y. 80, 106 N.E.2d 20 (1952). The Court of Appeals held that there was no error in charging the jury that the place of the killing need not be proved beyond a reasonable doubt. The Court also held that the admission into evidence of the holster introduced into evidence in the first trial was not 'a material error' requiring reversal because the District Attorney's statement that was found so objectionable in the appeal from the first trial was lacking, and the trial judge had instructed the jury that even if they believed that this holster was the one previously seen in Hetenyi's car, 'they may not draw from that the inference that he possessed the gun which it accommodated.' However, the Court found that certain other conduct of the District Attorney had deprived Hetenyi of a fair trial and on the basis of those errors reversed. The Court viewed the 'District Attorney's repeated accentuation of the defendant's failure to testify' as sufficient to make the trial unfair; and it held that the District Attorney's attack on Hetenyi's character in which the changes in Hetenyi's religious affiliations were emphasized and Hetenyi was accused of being a 'renegade,' 'a man to whom religion is a fraud, who engages in it purely and simply for selfish reasons,' violated a 'rule of fundamental fairness in the protection of the individual against unjust prosecution.' A new trial was ordered.
 
 
 5
 Hetenyi was then tried for the third time. This third trial took place in March, 1953 in the Onondaga County Court, as Hetenyi had obtained a change in venue. Once again he was tried upon the same 1949 indictment charging him with first degree murder; and as was done in the other two trials, the trial judge gave the jury the alternatives of returning a verdict of guilty of first degree murder, guilty of second degree murder, guilty of first degree manslaughter, or not guilty. The jury returned a verdict of guilty of second degree murder, and Hetenyi was sentenced to prison for forty years to life. He appealed to the Appellate Division, Fourth Department, and that court affirmed the judgment in a per curiam opinion. 282 App.Div. 1008, 125 N.Y.S.2d 689 (1953). The Appellate Division noted that the verdict 'is amply supported by the evidence' and that 'throughout the trial the Court exercised extreme care in protecting the rights of the defendant,' and concluded that the record 'contains no errors which so adversely affect the substantial rights of the defendant as to warrant reversal of the judgment and a new trial.' Leave to appeal to the New York Court of Appeals was denied.
 
 
 6
 Hetenyi is presently being held in custody pursuant to a warrant of commitment issued by the Onondaga County Court upon this judgment of conviction. He claims that it was unconstitutional for the State to prosecute him for first degree murder subsequent to the first trial, and that the prosecution for first degree murder so tainted the third trial as to render it constitutionally inadequate.
 
 
 7
 This is not the first instance that Hetenyi claimed his detention is unlawful. Hetenyi sought a writ of habeas corpus from the New York courts, but the court of general jurisdiction dismissed the writ and this dismissal was affirmed by the Appellate Division, Third Department, 10 A.D.2d 121, 198 N.Y.S.2d 18, reargument denied, 12 A.D.2d 574, 209 N.Y.S.2d 287 (1960), leave to appeal denied, 8 N.Y.2d 706, 202 N.Y.S.2d 1025, 168 N.E.2d 395, appeal dismissed, 8 N.Y.2d 913, 204 N.Y.S.2d 158. The Appellate Division found Hetenyi's claim to be without merit under the state and federal Constitutions, and added 'one last point not raised by the briefs': the relator at neither his second nor his third trial raised the question of double jeopardy or entered such a plea and therefore he 'waived his right to the defense of double jeopardy' under both federal and state constitutional standards. Without attempting to assess the sufficiency of the Appellate Division's conclusion, it should be noted that the factual premise appears incorrect. The petition in the present proceeding alleges that in both the second and third trials Hetenyi entered a plea of autrefois acquit. Respondent did not put that allegation into controversy below, and quite understandably the District Court did not make any finding as to its truth. We are nevertheless prepared to view the allegation as true, and thus to reject all factual basis for the waiver argument. In the course of argument before this Court, relator's counsel supported the allegation by reference to the trial transcript of the third trial, he explained that reargument was sought from the Appellate Division in order to correct its factual inaccuracy, and he suggested that reargument was denied by the Appellate Division not because there was no factual error, but because the waiver argument resting on this factual inaccuracy was offered only as an alternative ground for affirming the order dismissing the writ. Respondent did not take issue with this offer of proof and explanation. We thus have no reason to disbelieve the allegation in the present habeas petition that the plea of autrefois acquit was entered but disallowed in the second and third trials.
 
 
 8
 Nor is this the first instance in which Hetenyi presented his constitutional claim to a federal court. After his application for the state habeas writ was dismissed, Hetenyi applied to a federal district court for a writ, though this time his claim was formulated solely on the basis of the federal Constitution. On January 4, 1963 the District Court denied the application without prejudice and without reaching the merits. Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761 (1950), was held controlling and the habeas application was denied because Hetenyi had failed to file a petition for a writ of certiorari in the United States Supreme Court seeking review of the denial of his previous habeas application in the state courts. The District Court denied Hetenyi's application for a certificate of probable cause and Hetenyi applied to this Court for a certificate. This Court denied that certificate on May 8, 1963, even though Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) overruled Darr v. Burford some two months earlier and thus removed the procedural obstacle that had prevented the District Court from reaching the merits. Following this Court's denial of the certificate of probable cause, Hetenyi petitioned the Supreme Court for a writ of certiorari. On January 6, 1964 that petition was denied, with Mr. Justice Douglas noting that he was 'of the opinion that certiorari should be granted.' 375 U.S. 980, 84 S.Ct. 495, 11 L.Ed.2d 426.
 
 
 9
 Hetenyi persisted and renewed his application to a federal district court for the writ of habeas corpus. That court-- at last-- turned to the merits, but denied the application without a hearing[5] and unjustifiably refused to grant a certificate of probable cause. We granted the certificate and Hetenyi's constitutional claim is now before us.
 
 I.
 
 10
 The Due Process Clause of the Fourteenth Amendment imposes some limitations on a state's power to reprosecute an individual for the same crime. Abhorrence to successive reprosecutions is deeply rooted in our common law traditions, and the Bill of Rights' curb on the power of the federal government to reprosecute is ample recognition of how central this abhorrence is to our constitutional concept of justice. Similar limitations have been placed on each of the states by their own constitutions and laws,[6] and this reveals a societal understanding that certain reprosecutions by a state are incompatible with due process of law. To hold, as we do, that the Due Process Clause of the Fourteenth Amendment imposes some restrictions on a state's power to reprosecute, thereby spanning the gap between the Fifth Amendment's double jeopardy prohibition and a similar prohibition derived from state laws, is to preserve this societal understanding and to read the Fourteenth Amendment as entrusting the federal courts with a responsibility and power to decide which reprosecutions by a state violate our basic notions of justice.
 
 
 11
 The Supreme Court has not, to this day, invalidated any conviction obtained in the state courts on the ground that the state has transgressed the federal constitutional limitations on its power to reprosecute an individual for the same crime. Yet authority for our initial proposition that some such limits do exist can be derived, first, from the premises and presumptions revealed in those Supreme Court cases in which a double jeopardy claim was interposed against a state, and, secondly, from the doctrine of selective incorporation, supported by a majority of the present Supreme Court, according to which certain guarantees of the Bill of Rights, those that are fundamental, are absorbed by the Due Process Clause of the Fourteenth Amendment and are thus made applicable to the states.
 
 
 12
 In 1902 Mr. Justice Harlan writing for the Court in Dreyer v. State of Illinois, 187 U.S. 71, 85-86, 23 S.Ct. 28, 47 L.Ed. 79, considered it an open question whether the Due Process Clause of the Fourteenth Amendment imposed any restrictions on the power of a state to reprosecute. In that case it was claimed that Illinois had transgressed those restrictions by reprosecuting the complainant after the first jury, having failed to agree, was discharged. The Court held that even under Fifth Amendment standards, as established by United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), the claim of double jeopardy was ill founded, and that therefore it could 'pass this important question (of whether the Due Process Clause of the Fourteenth Amendment curbed the power of the states to reprosecute) without any consideration of it upon its merits.' This same question was similarly avoided in a like fashion in another case involving a reprosecution by a state following a hung-jury, Keerl v. State of Montana, 213 U.S. 135, 138, 29 S.Ct. 469, 53 L.Ed. 734 (1909); and perhaps Mr. Justice Harlan's opinion in Shoener v. State of Pennsylvania, 207 U.S. 188, 195-196 (1907) (trial on second indictment after first indictment dismissed on appeal as not charging a crime), could be read as employing the same technique of avoidance, although in Shoener it was necessary to determine as an original proposition that the Fifth Amendment standard was not violated, that the second prosecution did not place the complainant in double jeopardy, before it could 'avoid' the question of whether any state reprosecutions would violate the Due Process Clause of the Fourteenth Amendment.[7]
 
 
 13
 The next important step occurred in 1937 in Palko v. State of Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288. The mode of analysis employed by Mr. Justice Harlan in Dreyer v. State of Illinois, which enabled that Court to avoid the question whether the Due Process Clause of the Fourteenth Amendment had any double jeopardy content, was unavailable to the Court in Palko, see 302 U.S. at 322-323, 58 S.Ct. 149, 150. The complainant in Palko challenged the power of a state to appeal from a judgment of conviction for a lesser degree of homicide than that charged in the indictment and to reprosecute him for the greater degree upon obtaining a reversal. Mr. Justice Cardozo read Kepner v. United States, 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114 (1904), as holding that such reprosecution would fall within the pale 'of the prohibition of double jeopardy in federal prosecutions' and he 'assumed for the purpose of the case at hand' that Kepner was still good law. Thus unable to employ the technique of avoidance fashioned in Dreyer v. State of Illinois, he sought to avoid the broader question of whether the Due Process Clause of the Fourteenth Amendment imposed any restrictions on a state's power to reprosecute an individual for the same crime by delineating the narrower question whether this particular 'kind of double jeopardy' exceeded the limits imposed upon the states by the Due Process Clause of the Fourteenth Amendment. 302 U.S. at 328, 58 S.Ct. 149. However, in dealing with this narrower question it was necessary to articulate the 'rationalizing principle' of the Due Process Clause and this principle was cast in such terms as to provide the foundation for an affirmative answer to the broader question. Drawing his most immediate guidance from Twining v. State of New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908), Mr. Justice Cardozo perceived the principle in these terms: the Due Process Clause of the Fourteenth Amendment prohibited the states from enforcing their criminal laws at the cost of violating some fundamental precept of justice, of imposing a 'hardship so acute and shocking that our polity will not endure it.'
 
 
 14
 The next intellectual step, the realization that a reprosecution by a state, simply because it was a reprosecution, could violate a fundamental precept of justice, was of no moment, and was accomplished without formal notice. In a series of cases commencing ten years after Palko, an assumption, certainly of the persuasion of a holding, gradually arose that the Due Process Clause of the Fourteenth Amendment did impose some restrictions on the power of a state to reprosecute an individual for the same crime.
 
 
 15
 In State of Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 462-463, 67 S.Ct. 374, 375-376, 91 L.Ed. 422 (1947), the case of an unsuccessful execution, Mr. Justice Reed, writing for himself, Chief Justice Vinson, Mr. Justice Black and Mr. Justice Jackson declared that 'our minds rebel against permitting the same sovereignty to punish an accused twice for the same offense,' and concluded, inter alia, not that the Due Process Clause has no double jeopardy content, but that there is 'no double jeopardy here which can be said to amount to a denial of federal due process in the proposed execution.' Mr. Justice Frankfurter, concurring in the judgment to form the majority, explicitly stated that the Due Process Clause, viewed as prohibiting fundamentally unfair state procedures, had some double jeopardy content, see infra footnotes 8 and 9, while the dissenters did not concern themselves with double jeopardy, but only with the claim that a second attempt to execute the prisoner would be a cruel and unusual punishment. Then followed Gryger v. Burke, 334 U.S. 728, 732, (1948), where a unanimous Court held, without reserving the question of whether the Due Process Clause of the Fourteenth Amendment had any double jeopardy content, that a multiple offender statute does not subject 'petitioner to double jeopardy,' since the sentence as a multiple offender is not 'viewed as either a new jeopardy or additional penalty for the earlier crimes.' See supra footnote 7. The Court was not unanimous in Brock v. State of North Carolina, 344 U.S. 424, 73 S.Ct. 349 (1953), yet the differences between the Justices arose not so much from the general proposition that the Due Process Clause places some limits on the power of a state to reprosecute, but from the application of this proposition to the particular reprosecution challenged-- the state retried the petitioner after the first trial was halted and a mistrial declared because of the temporary unavailability of testimony by witnesses for the prosecution. The concurring Justice (Frankfurter, J.) and the dissenting Justices (Vinson, C.J. and Douglas, J.) openly embraced this general proposition, and although Mr. Justice Minton, writing for the Court, was less explicit, he did perceive the question presented (using the language of Palko), as whether 'that kind of double jeopardy' was 'a hardship so acute and shocking that our polity will not endure it.' Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949), a case under the Double Jeopardy Clause of the Fifth Amendment was used to justify a negative answer to this question in Brock. Similarly in Hoag v. State of New Jersey, 356 U.S. 464, 78 S.Ct. 829, 2 L.Ed.2d 913 (1958) there was ample acknowledgment that certain state reprosecutions would be constitutionally impermissible. The petitioner was alleged to have robbed five persons on the same occasion. He was first tried and acquitted for robbing three of the victims; and the Supreme Court held that a second trial based on an indictment charging him with robbing the fourth victim was not an 'impermissible use of multiple trials.' Yet its premise was that some uses of multiple trials would be constitutionally impermissible, see 356 U.S. at 467-469, 78 S.Ct. at 833. See also Ciucci v. State of Illinois, 356 U.S. 571, 78 S.Ct. 839, 2 L.Ed.2d 983 (1958) (fragmented prosecution for homicide). Bartkus v. State of Illinois, 359 U.S. 121, 79 S.Ct. 676 (1959), completes this evolution, for in that case all the Justices assumed that there is some double jeopardy content to the Fourteenth Amendment. A state reprosecution following an acquittal in a federal prosecution for the same conduct, robbing a federally insured savings and loan association, was held permissible only because it was viewed as a reprosecution by anothersovereignty for a crime against it. See also Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959). But compare Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). The Court's opinion in Bartkus, written by Mr. Justice Frankfurter, contains abundant suggestions that if the successive prosecutions were both conducted by the same sovereignty, such as Illinois, the Due Process Clause of the Fourteenth Amendment would be violated; and Mr. Justice Frankfurter's separate concurrences in State of Louisiana ex rel. Francis v. Resweber, supra, 329 U.S. at 469[8] 67 S.Ct. at 379 and Brock v. State of North Carolina, supra, 344 U.S. at 429,[9] 73 S.Ct. at 351, need only be recalled to confirm this interpretation. Thus Bartkus firmly establishes that the Due Process Clause of the Fourteenth Amendment does impose some restrictions on the power of a state to reprosecute an individual for the same crime, though we are told, by none other than Mr. Justice Frankfurter, that this proposition had been established more than thirty years prior: 'In Palko, the Court ruled that * * * at some point the cruelty of harassment by multiple prosecutions by a State would offend due process.' 359 U.S. at 127, 79 S.Ct. at 680, 3 L.Ed. 684.
 
 
 16
 Authority for this proposition can also be derived from the doctrine of selective incorporation, under which certain guarantees of the Bill of Rights, those that are fundamental, are absorbed by the Fourteenth Amendment and thereby made applicable to the states. This doctrine, which received its most immediate formulation in Mr. Justice Brennan's dissenting opinion in Cohen v. Hurley, 366 U.S. 117, 154, 81 S.Ct. 954, 6 L.Ed.2d 156 (1961) has been firmly adopted, at least in its broad outlines, as part of constitutional law by Pointer v. State of Texas, 33 U.S.L.Week 4306 (U.S. April 5, 1965), if not by Malloy v. Hogan, 378 U.S. 1, 10-11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). See also Griffin v. State of California, 85 S.Ct. 1229 (U.S. April 28, 1965); Douglas v. State of Alabama, 85 S.Ct. 1074 (U.S. April 5, 1965); Brennan, The Bill of Rights and the States, 36 N.Y.U.L.Rev. 761 (1961); Henkin, 'Selective Incorporation' in the Fourteenth Amendment, 73 Yale L.J. 74 (1963). For this doctrine to lend support to the proposition that the Fourteenth Amendment imposes some restrictions on the power of the states to reprosecute, the judgment need only be made that at least the basic core of that double jeopardy guarantee can be ranked as fundamental. We have no hesitation in so holding. The Supreme Court has not made this value judgment in the context of applying the doctrine of selective incorporation. Yet there can be no doubt that 'the idea that one trial and one punishment were enough' 'was brought to this country by the earliest settlers as part of their heritage of freedom, and * * * it has been recognized here as fundamental again and again,' Bartkus v. State of Illinois, supra, 359 U.S. at 153-154, 79 S.Ct. at 697 (Black, J. dissenting) and it has been declared that 'the basic idea is part of our American concept of fundamental fairness,' Brock v. State of North Carolina, supra, 344 U.S. at 435, 73 S.Ct. at 354 (Vinson, C.J., dissenting). See also, Ex parte Lange, 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1874), and the majority and dissenting opinions in Green v. United States, 355 U.S. 184, 198, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). Moreover, we are led to the same conclusion by comparing the basic core of the double jeopardy provision of the Fifth Amendment to those other guarantees of the Bill of Rights already held by the Supreme Court, at least in effect, to be absorbed-- the First Amendment,[10] the Fourth Amendment,[11] the Just Compensation[12] and Self-Incrimination[13] Clauses of the Fifth Amendment, the Right to Counsel[14] and Confrontation Clauses[15] of the Sixth Amendment, and the Eighth Amendment's prohibition against cruel and unusual punishments.[16] It would be indeed difficult to maintain that the basic core of the double jeopardy guarantee is not as fundamental as some of these guarantees and that therefore it should not be included in the universe of those guarantees of the Bill of Rights that are absorbed by the Fourteenth Amendment and made applicable to the states. Palko lends no support to such exclusion.
 
 
 17
 In Palko Mr. Justice Cardozo noted that certain 'privileges and immunities * * * have been taken over from the earlier articles of the Federal Bill of Rights and brought within the Fourteenth Amendment by a process of absorption.' He 'assumed' that the procedure challenged would be impermissible under the Fifth Amendment standards[17] if it were employed by the federal government rather than a state, and yet held that the procedure did not violate the Due Process Clause of the Fourteenth Amendment. Although Palko, if its authority is presumed to be unimpaired, perhaps means that not all of the double jeopardy guarantee of the Fifth Amendment would be 'absorbed' under the doctrine of selective incorporation, it does not mean that no part of the guarantee would be 'absorbed,' or that the basic core of the guarantee would not be 'absorbed.' See generally, Henkin, 'Selective Incorporation' in the Fourteenth Amendment, 73 Yale L.J. 74, 80-81 (1963). Undoubtedly Mr. Justice Cardozo was much attracted by Mr. Justice Holmes' dissent in Kepner, see Mayers & Yarbrough, Bix Vexari: New Trials and Successive Prosecutions, 74 Harv.L.Rev. 1, 11-12 (1960), and it is clear that he did not regard the basic core of the double jeopardy protection threatened by the Connecticut statute. See 302 U.S. at 328, 58 S.Ct. 149.
 
 
 18
 There is a serious question as to whether the doctrine of selective incorporation permits two levels of selection-- absorption of only those provisions of the Bill of Rights that are fundamental, and then absorption of only that part of the provision that is fundamental, its basic core. Many statements in recent Supreme Court decisions suggest a negative answer to that question, see Cohen v. Hurley, supra, 366 U.S. at 154, 81 S.Ct. 954 (Brennan, J., dissenting); Malloy v. Hogan, supra, 378 U.S. at 11, 84 S.Ct. 1489; Ker v. State of California, 374 U.S. 23 (1963); Griffin v. State of California, 85 S.Ct. 1229 (U.S. April 28, 1965). It is nevertheless possible that the doctrine of selective incorporation may permit two levels of selection at least in relation to the double jeopardy provision of the Fifth Amendment. It has been suggested that certain of the restrictions emanating from this provision are, unlike many of the provisions of the Bill of Rights already absorbed, 'technical ramifications,' Brock v. State of North Carolina, supra, 344 U.S. at 435, 73 S.Ct. 349 (Vinson, C.J., dissenting) and that some of the cases involving that provision turn on 'subtle technical controversies,' id. at 428, 73 S.Ct. 349 (Frankfurter, J., concurring), 'engendered by technical aspects of double jeopardy as enshrined in the Fifth Amendment,' State of Louisiana ex rel. Francis v. Resweber, supra, 329 U.S. at 469, 67 S.Ct. at 379 (Frankfurter, J., concurring). Moreover, Justice Goldberg's concurrence in Pointer v. State of Texas, announcing his acceptance of the process of absorption, finds this process to be conceived in Palko-- which is both consistent and suggestive of a version of the doctrine of selective incorporation which permits only the basic core of the Double Jeopardy Clause of the Fifth Amendment to be absorbed by the Fourteenth Amendment.
 
 
 19
 However, even if this version of the doctrine of selective incorporation be rejected the Supreme Court has three alternatives: (i) holding that the doctrine of selective incorporation does not reach the double jeopardy provision of the Fifth Amendment; (ii) overruling Palko; or (iii) overruling those prior decisions,[18] such as Kepner, that withheld from the federal government the power to conduct reprosecutions that have not been considered to be fundamentally unfair and hence not forbidden to the states. We find the first alternative the most unlikely, primarily because it is predicated on the value judgment that the double jeopardy guarantee of the Fifth Amendment, taken in this instance to be as wide as the provision itself, is not fundamental. Yet even if it be finally determined that the doctrine of selective incorporation does not permit two levels of selection, and further the first alternative set out above is chosen, the conclusion is, in light of Bartkus and its precursors, not that the Due Process Clause of the Fourteenth Amendment imposes no limitations on the power of the states to reprosecute, but rather that those limitations are not structured in terms of the double jeopardy provision of the Fifth Amendment. This might make a difference as to which reprosecutions are constitutionally forbidden to the states, but it would not impair our initial proposition that some reprosecutions are forbidden.
 
 II.
 
 20
 In attempting to formulate the standards for determining which state reprosecutions transgress the limitations imposed by the Due Process Clause of the Fourteenth Amendment, we envision three alternative standards:
 
 
 21
 (1) The Federal Standard. Under this standard the state reprosecution would be tested by the provision of the Fifth Amendment commanding that no person shall be 'subject for the same offence to be twice put in jeopardy of life or limb.' All the cases applying this clause to federal prosecutions would have the persuasion of precedent, and this inheritance would have the effect of accelerating the usual development of decisional constitutional law. Such a standard would emanate from a holding that the doctrine of selective incorporation reaches the double jeopardy provision of the Fifth Amendment, and further that this provision is absorbed intact, that the doctrine does not permit a second level of selection.
 
 
 22
 (2) The Basic Core Standard. This standard would stem from the inclusion of the double jeopardy provision of the Fifth Amendment within the doctrine of selective incorporation, with the understanding that the criteria of fundamentality would be applied once again so as to delineate the basic core of that provision; it would be this basic core that is absorbed by the Fourteenth Amendment. Under this standard the state reprosecution would be tested by the Fifth Amendment double jeopardy provision, but there would be a further need to determine, once it is decided that the reprosecution falls within the ambit of that provision, whether such restrictions are fundamental to the provision. Cases applying the provision to federal prosecutions would be of precedential value only after it has been determined that the result did not turn on a technical nuance of the provision.
 
 
 23
 (3) The Fundamental Fairness Standard. This standard has its roots in a concept of due process that is not structured by the absorption of any specifics of the Bill of Rights and thus it reflects a rejection of both versions of the doctrine of selective incorporation or finds the double jeopardy guarantee not within the reach of that doctrine. To apply this standard, the question is asked whether the state reprosecution challenged is fundamentally unfair and the cases applying the Fifth Amendment to federal prosecutions are not binding, although they, like those cases applying double jeopardy provisions derived from state law, are entitled to weighty consideration.
 
 
 24
 We find it both undesirable and unnecessary to choose among these alternative standards. This opinion is being written at a moment when this dimension of constitutional law is being reconsidered and refashioned by the Supreme Court and therefore the only advantage to be found from choosing among the standards-- guidance for other lower courts-- would not be forthcoming, or at the most it would be transitory. Moreover, choosing among the standards would be somewhat pretentious. Choosing would require us to engage in a debate that has sharply divided the Supreme Court, it might involve an implicit if not an explicit overruling of venerable Supreme Court decisions, and it is unnecessary for us to choose among the standards in order to decide the instant case. Under any of the three alternative standards, the conclusion is unavoidable that New York transgressed the federal constitutional limitations on its power to reprosecute an individual for the same crime. The reprosecution of Hetenyi for first degree murder following the completion of the first trial, in which he was prosecuted for first degree murder and the jury returned a verdict of guilty of second degree murder, constitutes such a transgression under any of the three standards.
 
 
 25
 Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), is decisive on this issue under the federal standard, and it goes a long way toward deciding the issue under the basic core standard. The factual pattern of Green, in its most essential aspects, is identical with that of the instant case, save that it involved reprosecutions by the District of Columbia, thereby making the Fifth Amendment directly applicable. The petitioner in Green was first tried under an indictment charging him with arson and first degree murder. The jury found him guilty of arson and of second degree murder; and he successfully appealed the second degree murder conviction. The Government then reprosecuted him for first degree murder and the Supreme Court held that such a reprosecution violated the double jeopardy provision of the Fifth Amendment. Thus under the federal standard, Green is ample viable precedent in support of Hetenyi's constitutional challenge to the successive reprosecutions for first degree murder. It also appears to be of equal force under the basic core standard, for Green involved more than a 'subtle technical controversy' and the decision rested on that aspect of the Fifth Amendment double jeopardy provision that must be ranked as fundamental. This can be gleaned from the tenor and the text of the Court's opinion (see e.g., the concluding paragraph, 355 U.S. at 198, 78 S.Ct. 221, 2 L.Ed.2d 199), even after some account is taken of the fact that the Justices were closely divided. It can also be supported by the same factors that will be considered in applying the fundamental fairness standard.
 
 
 26
 Our application of the fundamental fairness standard commences with a disclaimer. We are not proceeding on the factual assumption that when the jury at the first trial returned a verdict of guilty of murder in the second degree it also (impliedly) returned a verdict of not guilty of murder in the first degree. We start from the view that the jury's silence on the first degree murder charge simply meant that the state had tried but failed to obtain a conviction on the first degree murder charge, and we recognize that there are several possible explanations for this failure: (a) An acquittal on the first degree murder charge-- the jury unanimously believed that the prosecution had failed to prove beyond a reasonable doubt that Hetenyi killed his wife with a premeditated and deliberate design (although, as seen from the guilty verdict on the second degree murder charge, they believed that the prosecution had proved beyond a reasonable doubt that he intentionally committed the homicide). (b) A failure to agree on the first degree murder charge-- the jury could not reach any unanimous judgment as to whether or not the prosecution had proved beyond a reasonable doubt that Hetenyi killed his wife with a premeditated and deliberate design (although they could reach a unanimous judgment on the second degree charge and chose the alternative they all agreed upon). (c) An expression of sympathy-- the jury unanimously believed that the prosecution had proved beyond a reasonable doubt that Hetenyi killed his wife with a premeditated and deliberate design, but chose to render a guilty verdict on the second degree murder charge rather than the first degree murder charge because they all 'felt sorry for him' or thought the penalties for the greater degree would be 'too severe.' (d) A nonrational choice-- for example, the jury did not understand the difference between the various degrees of homicide or the jury made a choice between the various degrees on the basis of some method of random selection.
 
 
 27
 There is no way of conclusively deciding now, as a factual matter, which of the above alternatives explains the jury's silence. Certainly, the first alternative set out above-- that the silence implied an acquittal-- is at least a reasonable possibility. Cf. Green v. United States, supra, 355 U.S. at 190-191, 78 S.Ct. 221. An inconsistency between acquitting him of first degree murder and convicting him of second degree murder might suggest that the silence could be explained as an expression of sympathy or a nonrational choice, see Mayers & Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv.L.Rev. 1, 24 (1960), but there is no inconsistency here. Also the jury was charged[19] not to 'reduce the crime charged to a lower degree simply for the purpose of avoiding the performance of an unpleasant duty' and it was charged in such a manner that would make it superfluous for it to add to its verdict finding Hetenyi guilty of second degree murder the words 'And we also find him not guilty of first degree murder.' However, although there is a reasonable possibility that the first jury's silence on the greater charge was due to its unanimous belief that the prosecution failed to prove that charge beyond a reasonable doubt, this is not the only possibility. The silence permits only one certainty-- the state had tried but failed to obtain a conviction for that first degree murder. Starting from this basic datum we conclude that in these circumstances a reprosecution for first degree murder is fundamentally unfair.
 
 
 28
 Even viewing the four alternative explanations of the jury's silence set out above as equal possibilities, we are of the opinion that it was fundamentally unjust to reprosecute Hetenyi for first degree murder after the completion of the first trial. Such a reprosecution was cruel and inhuman, imposing on the accused a 'hardship so acute and shocking that our polity will not endure it' (Palko v. State of Connecticut, 302 U.S. at 328, 58 S.Ct. 149, 153, 82 L.Ed. 288), and we make this judgment with full realization that the 'standards of fairness and justice' to be applied are not 'merely personal standards but the impersonal standards of society which alone judges, as the organs of Law, are empowered to enforce' (Mr. Justice Frankfurter concurring in State of Louisiana ex rel. Francis v. Resweber, supra, 329 U.S. at 470, 67 S.Ct. 374, 379). The insecurity and anxiety, the opportunity of harassment, and the marginal increase in the probability of convicting the accused of a crime he did not commit by simply trying him again form the basis of our fear and abhorrence of reprosecutions. These evils are all presented by a reprosecution for first degree murder following the jury's silence on that charge. Their presence does not hinge upon whether this silence factually meant that Hetenyi had been acquitted of the charge in contrast to the uncontroverted fact that the state failed to convict Hetenyi of that charge. Cf. Ex parte Lange, supra, 85 U.S. at 169, 21 L.Ed. 872; United States v. Ball, 163 U.S. 662, 669 (1896); Kepner v. United States, supra, 195 U.S. at 130, 24 S.Ct. 797, 49 L.Ed. 114; Green v. United States, supra, 355 U.S. at 187, 78 S.Ct. 221; Fong Foo v. United States, 369 U.S. 141, 82 S.Ct. 671 (1962); Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963). There are, at least under the fundamental fairness standard, certain circumstances in which the legitimate societal interest justify a reprosecution, even though it may impose these hardships on the accused, but we are unable to find any such interest in the instant case. In fact, what New York offers as the justification for such reprosecutions turns out to be an additional evil contributing, quite materially, to the fundamental unfairness-- that the reprosecution for first degree murder was conditioned upon the accused successfully appealing from the second degree murder conviction.[20]
 
 
 29
 Prior to 1881 the courts of New York held that if an accused was tried for a greater degree of a crime and the jury returned a verdict for a lesser degree and was silent on the greater degree, as it usually is, the State could not reprosecute the accused for the greater degree (regardless of whether the accused successfully appealed his conviction for the lesser degree). Guenther v. People, 24 N.Y. 100 (1861); People v. Dowling, 84 N.Y. 478 (1881). This was ample recognition of the unfairness and injustice of a reprosecution for the greater charge. However, in 1881 the Legislature of New York enacted sections 464[21] and 544[22] of the Code of Criminal Procedure, which provide that granting a 'new trial places the parties in the same position as if no trial had been had' and the new trial 'shall proceed in all respects as if no trial had been had.' These sections were interpreted as authorizing reprosecution on the greater degree charged if the conviction on the lesser degree is reversed, and it was also held that such reprosecutions were not forbidden by the state constitutional guarantee against double jeopardy, People v. Palmer, 109 N.Y. 413, 17 N.E. 213 (1888); see also, People v. McGrath, 202 N.Y. 445, 96 N.E. 92 (1911); People v. Ercole, 4 N.Y.2d 617, 152 N.E.2d 77, 176 N.Y.S.2d 649 (1958). Yet it remained the law of New York that if the conviction on the lesser charge was left standing, either because no appeal was taken or the appeal was not successful, a reprosecution for the greater charge, upon which the jury was silent, would be impermissible. In that instance the jury's silence on the greater charge would be 'equivalent to a verdict of not guilty' of that charge, People v. McCarthy, 110 N.Y. 309, 314, 18 N.E. 128, 129 (1888); N.Y. Penal Law 32.[23] Hence, New York conditions the power of the state to reprosecute upon a successful appeal by the accused from the conviction for lesser charge, or, to look at it from the view of the accused, under New York law, his right to appeal from a conviction for the lesser degree can only be exercised at the risk of being reprosecuted for the greater charge as well as the lesser charge if the appeal is successful, even though the state had once failed to obtain a conviction on the greater charge. This places the accused in a dilemma which was described by the Supreme Court in Green v. United States, supra, 355 U.S. at 193, 78 S.Ct. 221, as 'incredible,' and which is, to be sure, no less incredible because it was devised by New York rather than the federal government. By placing this unconscionable premium upon a successful appeal by an accused, a vital societal interest is threatened-- assuring that liberty shall not be deprived without a trial free from legal error prejudicing the accused's substantial rights. Compare Stroud v. United States, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919); People v. Henderson, 60 Cal.2d 472, 386 P.2d 677, 686 (1963); see Van Alstyne, In Gideon's Wake: Harsher Penalties and the 'Successful' Criminal Appellant, 74 Yale L.J. 606, 623-636 (1965).
 
 
 30
 It is difficult to understand how the fundamental unfairness inherent in allowing a prosecutor to 'do better a second time' (Mr. Justice Frankfurter, concurring in Brock v. North Carolina, supra, 344 U.S. at 429, 73 S.Ct. at 351) is mitigated by conditioning this second chance on a successful appeal by the accused. To suggest that the accused, by appealing the conviction, somehow 'agreed' to subject himself to the reprosecution on the greater charge if the conviction for the lesser charge is reversed, thereby rendering such a reprosecution fair, cf. People v. Palmer, supra, is to ignore the elementary psychological realities of the situation, see, Kepner v. United States, supra, 195 U.S. at 135, 24 S.Ct. 797 (Holmes, J., dissenting), Green v. United States, supra, 355 U.S. at 192, 78 S.Ct. 221 and to presume, quite inconsistently with the evolution of our communal values, that a barter theory of fairness operates with no less force in the halls of justice than it does in the market place, see generally, Fay v. Noia, 372 U.S. 391, 83 S.Ct. 322, 9 L.Ed.2d 837 (1963). Nor do we find any merit to the suggestion, cf. People v. Ercole, supra, that the reprosecution for the greater charge following the jury's silence on the greater charge and the reversal of the conviction for the lesser charge, serves the same interest as that served by the reprosecution held to be constitutional in Palko-- that the case against the accused 'go on until there shall be a trial free from the corrosion of substantial legal error,' 302 U.S. at 328, 58 S.Ct. at 153.
 
 
 31
 In Palko the petitioner was initially tried for first degree murder. The jury returned a verdict of guilty of second degree murder and then the state was allowed to reprosecute petitioner for first degree murder following a reversal. The state had appealed from the judgment of conviction for second degree murder and it attacked, not the conviction it had obtained, but the one it had failed to obtain-- the silence of the jury on the first degree murder charge.[24] Reversal on the state's appeal meant that the state had been prejudiced by substantial legal error, or to put it another way, the state's failure to obtain a guilty verdict on the first degree murder charge was in part infected by substantial legal error. To permit the state to reprosecute the accused for the greater charge in these circumstances was to provide the state with an opportunity 'to do better a second time' only because it had been prejudiced by substantial legal error the first time, not because it simply failed to succeed the first time. The Supreme Court in Palko thought that this could hardly be classified as fundamentally unfair.
 
 
 32
 In contrast to Palko, in the instant case the state did not appeal and the accused's appeal was, of course, not based on a view that the failure of the state to obtain a conviction for first degree murder was infected by substantial legal error, but rather that the conviction the state had obtained was so infected. The success of Hetenyi's appeal meant that he was prejudiced by substantial legal errors, and there is no basis for supposing that these errors-- somehow-- corroded the substantial rights of the prosecution and contributed to its failure to obtain a conviction on the first degree murder charge. See supra pp. 846-847. The errors perceived could have only contributed to the success of the prosecution in obtaining a second degree murder conviction, not to the failure of the state to obtain a verdict of guilty of murder in the first degree. To permit the state to reprosecute the accused for the greater charge in these circumstances is to provide the prosecution with an opportunity 'to do better a second time,' not because it had been prejudiced by substantial legal error the first time, but because the accused had been prejudiced by substantial legal errors and because these errors had been perceived on appeal.
 
 
 33
 Where, as here, the errors perceived on appeal contributed to the success of the prosecution in obtaining the second degree murder conviction, and could have had no effect on the prosecution's lack of success in failing to obtain a first degree murder conviction, all legitimate interests served by permitting a reprosecution following a reversal of (see United States v. Ball,163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896)) or a successful collateral attack upon (see United States v. Tateo, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964)) a conviction are satisfied by restricting the reprosecution to the second degree murder charge-- the only one the jury found him guilty of on the first trial. By permitting reprosecution on the lesser charge, though barring it in these circumstances on the greater charge, the accused is not, to use the language of Mr. Justice Harlan, writing for the Court in United States v. Tateo, supra, 377 U.S. at 466, 84 S.Ct. at 1589 'granted immunity from punishment because' there were defects 'sufficient to constitute reversible error in the proceedings leading to the conviction'; and appellate courts will remain 'as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage,' because the reversal of the conviction for the lesser degree would not 'put the accused irrevocably beyond the reach of further prosecution,' not any more so than if he did not appeal the conviction for the lesser charge.
 
 
 34
 Kring v. State of Missouri, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1882), and Brantley v. State of Georgia, 217 U.S. 284, 30 S.Ct. 514, 54 L.Ed. 768 (1910), do not lead us to a contrary conclusion, although the pattern of reprosecutions in those cases is identical with that in the instant case. Under either the federal standard or the basic core standard, whatever precedential value Kring and Brantley possess is vitiated by the significantly more recent case of Green v. United States, which prohibited the same pattern of reprosecutions. It is true that in footnote 15 of the Green opinion, 355 U.S. at 194, 78 S.Ct. 221, 227, the statement is made that Brantley and Kring 'are not controlling here since they involved trials in state courts.' But this is merely to distinguish Brantley and Kring, not to approve them. It would not be unfair to say that at the time Green was decided, this distinction was not particularly meaningful to Mr. Justice Black, the author of the Court's opinion in Green, or to Mr. Justice Douglas, who, the very next Term, prefaced their joint dissent in Hoag v. State of New Jersey, supra, 356 U.S. at 477, 78 S.Ct. 829, 837, 2 L.Ed.2d 913 with the statement: 'Green v. United States * * *, involving a federal prosecution, provides * * * the standard for every state prosecution as well * * *.' And this distinction lost, in effect, all meaningfulness when the doctrine of selective incorporation, the source of the federal and basic core standards, became firmly established as part of our constitutional law in Pointer v. Texas, some eight years after Green.
 
 
 35
 Moreover, even under the standard of fundamental fairness, we do not regard Kring or Brantley as compelling a conclusion that the state had the power to reprosecute Hetenyi for first degree murder following the conclusion of the first trial.
 
 
 36
 First, it should be noted that Kring relates to the constitutional claim in this case only by way of a dictum-- a vague and conclusory dictum. Prior to 1875 Missouri followed the course similar to that followed by New York until 1881. Then Missouri, like New York, amended its Constitution to abrogate the rule that barred reprosecution for first degree murder where the individual was initially prosecuted for first degree murder, convicted of second degree murder, and he had successfully appealed this conviction. In Kring the Supreme Court did not hold that such a reprosecution satisfied the requirements of the Due Process Clause of the Fourteenth Amendment or that the clause had no double jeopardy content, a question Mr. Justice Harlan viewed as unresolved twenty years later in Dreyer v. Illinois, see supra pp. 850, 851. Instead the court held that the ex post facto clause of the federal Constitution prohibited the new procedure from being followed where the crime was alleged to have been committed before the amendment to the Missouri Constitution. It was as a prelude to sustaining this ex post facto claim that Mr. Justice Miller declared, without the slightest analysis or elaboration, 'There is no question of the right of the state of Missouri, either by her fundamental law or by an ordinary act of legislation, to abolish this rule, and that it is a valid law as to all offenses committed after its enactment,' 107 U.S. at 225, 2 S.Ct. at 447.
 
 
 37
 Secondly, the significance of Brantley, which saved this pattern of reprosecution from a constitutional challenge derived from the Due Process Clause of the Fourteenth Amendment,[25] is somewhat impaired by the fact that it was decided under the regime of Trono v. United States, 199 U.S. 521, 26 S.Ct. 121, 50 L.Ed. 292 (1905), which, if not overruled, was at least reduced to a non-constitutional stature by Green v. United States. Trono involved the same pattern of prosecution, though by the Government of the Philippine Islands, and this was held to be permissible. Trono had been handed down only five years before Brantley, and it was the only case the State of Georgia had cited in its brief to defend its power to reprosecute for the greater charge. Moreover, as late as 1909, one year prior to Brantley the Supreme Court had employed the mode of analysis devised by Mr. Justice Harlan in Dreyer v. State of Illinois, discussed supra, pp. 850, 851 of not deciding whether the Due Process Clause of the Fourteenth Amendment imposed double jeopardy limitations on the states by holding that even under Fifth Amendment standards the claims of double jeopardy were without merit. See Keerle v. State of Montana, supra, 213 U.S. at 138, 29 S.Ct. 469, 53 L.Ed. 734; see also the 1912 case of Graham v. State of West Virginia, supra, 224 U.S. at 631, 32 S.Ct. at 588. Read in this context the final sentence of the short Brantley per curiam, disposing of the constitutional challenge with the words, 'It was not a case of twice in jeopardy under any view of the Constitution of the United States,' 217 U.S. at 285, 30 S.Ct. at 515 could be fairly interpreted to mean that since Trono would permit the Government of the Philippine Islands, and perhaps even the federal government in general, to reprosecute the accused for the greater charge in such circumstances, there would be little basis for maintaining that a state would be barred by the Fourteenth Amendment from conducting such a reprosecution. Trono thus emerges as the linchpin of Brantley. Without Trono the Supreme Court might have reached the same result. But if Trono had been decided the other way, or, to express the same idea somewhat differently, if Green rather than Trono had been the antecedent to Brantley, the result in Brantley might have been quite different, even if the fundamental fairness standard were applied to determine whether the reprosecution were constitutionally permissible. Green not only construed the Double Jeopardy Clause of the Fifth Amendment; it also perceived and articulated the unfairness in such reprosecutions.[26] The fact that our constitutional understanding is now dominated by Green rather than Trono impairs the significance of Brantley.
 
 
 38
 Thirdly, and perhaps most significantly, the authority of Brantley and the Kring dictum (even if the latter be read to reach the instant double jeopardy claim) has been tarnished by the gradual but certain evolution of our constitutional understanding of justice and fairness. Mr. Justice Frankfurter, the most eloquent and ardent contemporary advocate of the fundamental fairness standard, consistently maintained that in applying this standard the courts are permitted, nay are required, to re-evaluate prior interpretations of the Due Process Clause in light of 'changing concepts as to minimum standards of fairness,' Green v. United States, supra, 355 U.S. at 215, 78 S.Ct. at 238 (dissenting opinion); see also, e.g., Malinski v. New York, 324 U.S. 401, 414, 65 S.Ct. 781, 89 L.Ed. 1029 (1945) (concurring opinion); Louisiana ex rel. Francis v. Resweber, supra, 329 U.S. at 466-467, 67 S.Ct. 377-378; Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); and with this view there could be little dispute. What was regarded as fair in one epoch of our history as a nation may be regarded as fundamentally unfair in the next, even though the judgment is 'not ad hoc and episodic but duly mindful of reconciling the needs of continuity and of change in progressive society,' id. at 172, 72 S.Ct. at 209. Kring (1882) and Brantley (1910) reached the Supreme Court at a time when the precepts of justice emanating from the Due Process Clause of the Fourteenth Amendment were rudimentary and insensitive to outrageous imperfections in the state criminal processes. To mention but two examples, it was not until the 1930's that a state conviction was invalidated under the Due Process Clause because it rested solely 'upon confessions shown to have been extorted by officers of the state by brutality and violence,' Brown v. State of Mississippi, 297 U.S. 278, 279, 56 S.Ct. 461, 462, 80 L.Ed. 682 (1936), or because an accused in a capital case was denied the effective assistance of counsel, Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); and it would be naive to suppose that in the seventy year period between the adoption of the Fourteenth Amendment and these decisions, no such defects existed or were complained of. Kring and Brantley arose during this lull in the Supreme Court's concern for constitutionally protected human rights, and, even if Kring and Brantley be read as declaring that this type of reprosecution is not so fundamentally unfair as to amount to a denial of due process of law, we would decline to follow them in applying the fundamental fairness standard, not merely because of their half century antiquity, but because we would not be faithful to the evolution of our societal values if we reached any other conclusion.
 
 
 39
 New York was constitutionally forbidden to reprosecute Hetenyi for first degree murder following the completion of the first trial and to the extent that sections 464 and 544 of the N.Y. Code of Criminal Procedure authorize such a reprosecution, they are inconsistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.
 
 III.
 
 40
 The judgment of conviction under which Hetenyi is presently imprisoned was entered after a third trial. In the second trial he was found guilty of first degree murder and sentenced to death, but that judgment of conviction was reversed by the New York Court of Appeals. Neither this first reprosecution for first degree murder, nor the fact that it resulted in a conviction for that degree of murder, nor the fact that the conviction was successfully appealed by the accused removed the constitutional restrictions against reprosecuting him for first degree murder following the completion of the first trial. What was forbidden after the first trial remained so for the third trial, notwithstanding the intervention of the second trial and that appeal.
 
 
 41
 If the third trial had resulted in a verdict of guilty of first degree murder and Hetenyi were presently imprisoned under that conviction, and the legality of that detention were challenged by a habeas petition, the writ would surely be granted. To deny the State the authority to reprosecute him for first degree murder is to deny it the authority of convicting him of that charge, of 'succeeding' in that reprosecution. Cf. Ex parte Lange,85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1874). We cannot find any sense to the suggestion 'that the issue of double jeopardy can not be raised by a habeas corpus proceeding,' Barker v. State of Ohio, 328 F.2d 582, 585, rehearing denied, 330 F.2d 594 (6 Cir. 1964). True, certain of the evils created by such reprosecutions, for example, the harassment and anxiety inflicted by the retrial itself, cannot be remedied by the habeas writ. But that would be true of any post-conviction relief, including direct appeal, which was employed by the Supreme Court in Green v. United States, to mention only one instance. This inadequacy of post-conviction relief is amply compensated by the fact that it can remedy some evils created by reprosecutions, such as the increased probability of obtaining a conviction by merely trying again, and it enables a court other than that which conducted the trial to vindicate and to protect the federal constitutional right.
 
 
 42
 However, unlike the accused in Green v. United States, Hetenyi does not stand convicted of first degree murder. On the third trial, the jury found him guilty of second degree murder, and, as another jury had done on the first trial, it remained silent on the first degree murder charge. The State was not denied the authority to reprosecute him for second degree murder following the completion of the first trial, and thus there may be a conceptual difficulty in maintaining it was denied the authority to convict him of that charge. Yet we believe that Hetenyi is being held in custody in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution because (1) there was a reasonable possibility that the conduct of the trial and the deliberations of the jury were affected by the fact that Hetenyi was indicted, prosecuted and charged with first degree murder and (2) the State was constitutionally forbidden to prosecute him for first degree murder following the completion of the first trial. Both the existence of this possibility of prejudice and the fact that it arises from a violation of the accused's constitutional rights render the process which resulted in his detention constitutionally inadequate, less than that which is constitutionally due.
 
 
 43
 The question is not whether the accused was actually prejudiced, but whether there is reasonable possibility that he was prejudiced. Fahy v. State of Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963) (illegally seized evidence); see also Glasser v. United States, 315 U.S. 60, 76, 62 S.Ct. 457, 86 L.Ed. 680 (1942) (denial of right to counsel); Malinski v. New York, 324 U.S. 401, 404, 65 S.Ct. 781, 89 L.Ed. 1029 (1945) (coerced confession); Payne v. State of Arkansas, 356 U.S. 560, 568, 356 U.S. 560, 2 L.Ed.2d 975 (1958) (coerced confession); Spano v. People of State of New York, 360 U.S. 315, 324, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (coerced confession); cf. Lyons v. State of Oklahoma, 322 U.S. 596, 597 n. 1, 88 L.Ed. 1481, 64 S.Ct. 1208 (1944) (dictum) (coerced confession). The ends of justice would not be served by requiring a factual determination that the accused was actually prejudiced in his third trial by being prosecuted for and charged with first degree murder, nor would the ends of justice be served by insisting upon a quantitative measurement of that prejudice. The energies and resources consumed by such injuiry would be staggering and the attainable level of certainty most unsatisfactory. There could never be any certainty as to whether the jury was actually influenced by the unconstitutionally broad scope of the reprosecution or whether the accused's defense strategy was impaired by this scope of the charge, even if there were a most sensitive examination of the entire trial record and a more suspect and controversial inquest of the jurors still alive and available.
 
 
 44
 The District Court below declared: 'Being in custody for the crime of Murder in the Second Degree, * * * it appears that the procedure complained of has not resulted in any hardship to relator.' It is doubtful whether this declaration could be viewed as a finding that the conduct of the trial or the deliberations of the jury could not reasonably have been affected by the fact that the accused was indicted and was being prosecuted for first degree murder and that the jury was given the alternative of finding him guilty of that charge. The mere fact that the accused is in custody for second degree murder, the only reason offered by the District Court to justify its conclusion that 'the procedure complained of has not resulted in any hardship to relator,' is not sufficient to exclude this possibility, or to make it less than reasonable. However, even if the statement were read as such a finding, it would not be entitled to the slightest credulence. The District Court did not call for or examine the transcript of the third trial, nor conduct an evidentiary hearing, cf. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), nor engage in any other factual inquiries, and thus the usual reasons for deferring to the findings of fact of the lower court are entirely lacking.
 
 
 45
 We are also of the opinion that no legitimate interest would be served by remanding the case to a non-appellate court for a finding as to whether there is a reasonable possibility that the conduct of the trial or the deliberations of the jury were affected by the range of the prosecution and charge. The question as to whether there is a reasonable possibility of prejudice has traditionally been posed and resolved by the appellate courts, as the harmless error statute (28 U.S.C. 2111) requires, at least in non-constitutional areas; and thus in this instance the accumulated experience to be drawn upon lies with appellate rather than trial judges. Moreover, in this instance, and on the elementary facts established-- that the indictment of the third trial charged first degree murder, that the prosecution focused on obtaining a conviction on that charge, and that the jury was given the alternative of finding him guilty of that charge-- we hold that there would be no rational basis for concluding that it is not reasonably possible that the accused was prejudiced by the unconstitutionally broad scope of the prosecution.[27]
 
 
 46
 The sufficiency of the evidence would not by itself be such a rational basis. Fahy v. State of Connecticut, supra, 375 U.S. at 86-87, 84 S.Ct. 229. We would surely hesitate before assuming, or assigning to any other court the responsibility of determining, whether there is ample evidence to support the verdict in a criminal case, especially when that evidence linking the accused with the criminal act is entirely circumstantial. That responsibility would require examining every line of testimony and every exhibit, resolving in favor of the accused all conflicts in testimony, and drawing all the inferences urged by the accused-- a task that is as subject to abuse as it is monumental. But even if that responsibility were assumed and faithfully discharged, and a court concluded that there was ample evidence to support the verdict finding Hetenyi guilty of second degree murder,[28] that court would not be justified in excluding the reasonable possibility that the accused was prejudiced by the unconstitutionally broad scope of the prosecution. The mere fact that Hetenyi could have-- logically and legally-- been convicted of second degree murder on the basis of all the evidence, does not mean that he would have been so convicted if he were not also charged with first degree murder. For example, it is entirely possible that without the inclusion of the first degree murder charge, the jury, reflecting a not unfamiliar desire to compromise might have returned a guilty verdict on the first degree manslaughter charge on the same evidence. There is, of course, no basis for predicting with any confidence, that this would have been the outcome of the third trial if Hetenyi had not been reprosecuted for first degree murder; but neither is there any basis for predicting, with any confidence, that this would not have been the outcome. To make this latter prediction on the basis of the sufficiency of the evidence would be to ignore reality and, in effect, to have judges make the choice entrusted to the jury.
 
 
 47
 Nor do we find section 30 of the N.Y.Penal Law to be a sufficient basis for excluding the possibility of prejudice. It provides: 'Whenever a crime is distinguished into degrees, the jury, if they convict the prisoner, must find the degree of the crime of which he is guilty.' Just as it is unrealistic to maintain that the first jury's silence on the first degree murder charge admits of only one possible explanation, that the jury unanimously believed the state had failed to prove all the elements of the charge beyond a reasonable doubt, see supra pp. , 856 it would be unrealistic to maintain that the third jury's verdict of guilty of second degree murder admits of only one explanation, that the jury unanimously believed the state failed to prove all the elements of first degree murder beyond a reasonable doubt, although it unanimously believed, without giving any consideration to the fact that the accused was also charged with first degree murder, that the state had proved the elements of second degree murder beyond a reasonable doubt. Cf. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed. 908 (1964). The point is not that the other explanations are more probable, but merely that they are possible and that they are within the realm of reason rather than fantasy. Although some of the other explanations, such as the jury compromising its verdict, depend on the jury having disobeyed certain commands of state law, this does not mean that they are not reasonably possible. Nor is there any reason not to preserve the accused's opportunity to reap one of the benefits of a new trial (absent the first degree murder charge) that might only be bestowed if the next jury disobeys state law and compromises its verdict. The opportunity to obtain such a benefit is a necessary incident to the accused's right to trial by jury and it would indeed be ironical, not to mention unfair, if the accused were deprived of that opportunity because the state violated his constitutional rights by reprosecuting him in these circumstances for first degree murder.
 
 
 48
 We are not suggesting that whenever the range of the prosecution is improperly broad or a greater charge is improperly submitted to the jury the trial is rendered constitutionally inadequate. We have no occasion to consider that more far-reaching question, for here the impropriety consisted of a violation of a federal constitutional mandate. The breadth of the prosecution and the submission to jury of the first degree murder charge were improper because they violated Hetenyi's constitutional right not to be reprosecuted for first degree murder following the completion of the first trial; his constitutional right was violated regardless of whether the reprosecution resulted in an acquittal or conviction for that crime. See supra, p. 858. The source of the impropriety does not increase the possibility of prejudice, nor does it alter the ways in which the error could work to the prejudice of the accused. See Fahy v. State of Connecticut, supra, 375 U.S. at 95, 84 S.Ct. 229 (dissenting opinion). Instead, its significance is derived from our understanding that an accused is not afforded due process of law when his federal constitutional rights have been violated and the conduct which violated his constitutional rights created a reasonable possibility of prejudicing the accused. This understanding reflects the view that an individual's federal constitutional rights are among those that are most fundamental and it enables a federal court to vindicate and protect those rights. The concept of 'due process of law' embodied in the Fourteenth Amendment then not only imposes substantive limitations on the power of the states to reprosecute an individual for the same crime; it also entitles an accused, as a condition of depriving him of his liberty, to a trial where there is no reasonable possibility that violation of his constitutional rights has worked to his prejudice.
 
 
 49
 We therefore hold: I. The Due Process Clause of the Fourteenth Amendment imposes some limitations on the power of the states to reprosecute an individual for the same crime. II. New York transgressed these limitations by reprosecuting Hetenyi for first degree murder following the completion of the first trial, notwithstanding Hetenyi's successful appeal of the second degree murder conviction obtained in that trial. III. There is a reasonable possibility that Hetenyi was prejudiced in his third trial by the fact that he was indicted, prosecuted and charged with first degree murder; and both this possibility of prejudice and the fact that it was created by conduct that violated the accused's constitutional rights rendered this trial constitutionally inadequate. Hetenyi has been deprived of his liberty without due process of law, and therefore he is being held in custody in violation of the Constitution. The order below denying Hetenyi's application for the writ of habeas corpus is reversed, with instructions that the writ be granted unless, within a reasonable time, New York affords Hetenyi a new trial that conforms to the principles set forth in this opinion.
 
 
 50
 Assigned counsel for relator on this appeal, Ernest J. Brown, Esq., of Cambridge, Massachusetts, represented his client with eloquence and perception, and we are indeed grateful.
 
 
 51
 Reversed.
 
 METZNER, District Judge (dissenting):
 
 52
 The question presented here is whether the guarantee contained in the Fifth Amendment against double jeopardy should be absorbed by the Fourteenth Amendment so as to make it applicable to state prosecutions. If the answer be yes, then the full scope of that guarantee as interpreted by the federal courts is applicable to the states. Malloy v. Hogan, 378 U.S. 1, 10, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).
 
 
 53
 Many state prosecutions have been challenged in the Supreme Court as violative of the guarantee against double jeopardy, but in none of these has the plea been sustained. These cases are all referred to in the majority opinion.
 
 
 54
 The leading authority on the subject is Palko v. State of Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 283 (1937). Palko presented a much stronger factual case for a determination contrary to the one reached by the Court than is presented here. Palko had been convicted of the crime of murder in the second degree on an indictment charging murder in the first degree. A sentence of life imprisonment was imposed. After reversal Palko was retried and convicted of murder in the first degree and sentenced to death. The clear refusal by the Court to find an invasion of Palko's guarantee against double jeopardy, as provided by the Fifth Amendment, allowed the death penalty to stand.
 
 
 55
 Hetenyi claims that he should have been retried only on a charge of second degree murder. The first retrial resulted in a verdict of guilty of murder in the first degree, but upon reversal and a second retrial he was found guilty of second degree murder, for which crime he is now incarcerated.
 
 
 56
 It may well be that, in view of the recent decisions of the Court (Mapp v. State of Ohio, 367 U.S. 643, 81 S.Ct. 168, 6 L.Ed.2d 1081 (1961), search and seizure; Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), cruel and unusual punishment; Gideon v. Wainright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), right to counsel; Malloy v. Hogan, supra, self-incrimination; Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), right to confrontation), either the test enunciated in Palko or the holding of constitutionality of the Connecticut statute involved therein will be overruled. But see the concurring opinions of Mr. Justice Harlan and Mr. Justice Goldberg in Pointer v. Texas, supra. However, the incorporation of guarantees of the Bill of Rights into the Due Process Clause of the Fourteenth Amendment at the expense of departing from several long-standing Supreme Court decisions is a step which should only be taken by that Court.
 
 
 57
 The order should be affirmed.
 
 
 
 *
 Sitting by designation
 
 
 [1]
 The indictment read:
 'The Grand Jury of the County of Monroe by this Indictment accuse the Defendant, George Hetenyi, of the crime of Murder in the First Degree, in violation of 1044, Subdivision 1 of the Penal Law of New York, McKinney's Consol.Laws, c. 40, committed as follows:
 'The Defendant, on or about April 22, 1949, in the County of Monroe, State of New York, willfully, feloniously, and from a deliberate and premeditated design to effect the death of Jean Gareis Hetenyi, killed the said Jean Gareis Hetenyi by shooting her twice in the body with a firearm, thereby inflicting injuries which resulted in and caused her death.'
 
 
 [2]
 N.Y.Penal Law 1044. 'Murder in first degree defined
 'The killing of a human being, unless it is excusable or justifiable, is murder in the first degree, when committed * * * from a deliberate and premeditated design to effect the death of the person killed, or of another * * *.'
 
 
 [3]
 N.Y. Penal Law 1046. 'Murder in second degree defined
 'Such killing of a human being is murder in the second degree, when committed with a design to effect the death of the person killed, or of another, but without deliberation and premeditation.'
 
 
 [4]
 N.Y.Penal Code 1050. 'Manslaughter in first degree
 'Such homicide is manslaughter in the first degree, when committed without a design to effect death * * * in the heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon.'
 
 
 [5]
 Unfortunately the transcripts of the three trials have not been made part of the record in this collateral proceeding. Nevertheless, in order to verify the presumptions concerning the alternatives posed to the jury in the charge, we have examined the transcript of the charge in each trial. For the first two trials we had access to the trial transcript incorporated in the records on appeal to the Appellate Division, Fourth Department and for the third trial, the Clerk of the Onondaga County Court has forwarded a certified copy of those portions of the trial transcripts containing the charge. We have pursued this extraordinary course of taking judicial notice of these public documents because further delay in reaching the merits of Hetenyi's claim would be painfully unjust and it would not serve either the interests of the accused or the State
 
 
 [6]
 Brock v. State of North Carolina, 344 U.S. 424, 435 nn. 5 & 6, 73 S.Ct. 349, 97 L.Ed. 456 (1953) (Vinson, C.J., dissenting); which must be updated by reference to Article I, section 9 of the Constitution of Alaska, and Article I, section 8, of the Constitution of Hawaii. See also Bartkus v. State of Illinois, 359 U.S. 121, 152-155, 79 S.Ct. 676, 3 L.Ed. 684, (1959) (Black, J., dissenting)
 
 
 [7]
 See also McDonald v. Com. of Massachusetts, 180 U.S. 311, 313, 21 S.Ct. 389 (1901) and Graham v. State of West Virginia, 224 U.S. 616, 631, 32 S.Ct. 583, 56 L.Ed. 917 (1912), avoiding the related question of whether the Due Process Clause of the Fourteenth Amendment places any limitation on a state's power to impose multiple punishment, by relying on the fact that the multiple-offender statutes in controversy would not violate such limitations placed on the federal government by the Double Jeopardy Clause of the Fifth Amendment. However, in an earlier case, Moore v. Missouri, 159 U.S. 673, 677, 16 S.Ct. 179, 40 L.Ed. 301 (1895), the Court did not make this distinction and simply held that a multiple offender statute did not punish an individual more than once for 'the first offense' but only increased the punishment on 'the last offense' and hence an accused sentenced according to the statute was 'not twice put in jeopardy for the same offense.' Cf. Carlesi v. New York, 233 U.S. 51, 34 S.Ct. 576, 58 L.Ed. 843 (1914)
 
 
 [8]
 'A State may offend such a principle of justice by brutal subjection of an individual to successive retrials on a charge on which he has been acquitted.'
 
 
 [9]
 'A State falls short of its obligation when it callously subjects an individual to successive retrials on a charge on which he has been acquitted or prevents a trial from proceeding to a termination in favor of the accused merely in order to allow a prosecutor who has been incompetent or casual or even ineffective to see if he cannot do better a second time.'
 
 
 [10]
 See, e.g., New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)
 
 
 [11]
 Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed. 726 (1963)
 
 
 [12]
 See Chicago, B. & Q. R.R. Co. v. City of Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897)
 
 
 [13]
 Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)
 
 
 [14]
 Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)
 
 
 [15]
 Pointer v. Texas, 85 S.Ct. 1065 (U.S.April April 5, 1965)
 
 
 [16]
 Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); see Malloy v. Hogan, supra, 378 U.S. at 6 n. 6, 84 S.Ct. 1489
 
 
 [17]
 Kepner arose in the Philippine Islands under a statutory prohibition against double jeopardy. But the statutory prohibition and Fifth Amendment employed identical language and apparently Mr. Justice Cardozo did not perceive any difference between that statutory standard and the constitutional standard applied to 'federal prosecutions.'
 
 
 [18]
 E.g., compare Brock v. State of North Carolina, 344 U.S. 424, 73 S.Ct. 349, 97 L.Ed. 45 (1953) with Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963) and Gori v. United States, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961)
 
 
 [19]
 The judge in the first trial charged the jury in part:
 'In other words, if you are satisfied beyond a reasonable doubt, based upon all of the evidence in this case, of the defendant's guilt of the crime charged, namely, murder in the first degree, you should not, under those circumstances, reduce the crime as charged to a lower degree simply for the purpose of avoiding the performance of an unpleasant duty.
 'I charge you that when it appears from the evidence that a reasonable ground of doubt in which of two or more degrees he is guilty he can be convicted of the lower degree only * * *
 'Your verdict in this case may be in one of the four forms: first, Guilty of Murder in the First Degree; second, Guilty of Murder in the Second Degree; third, Guilty of Manslaughter in the First Degree; fourth, Not Guilty.' (Recond on Appeal to the Appellate Division, Fourth Department, pp. 595-603.)
 
 
 [20]
 The possible explanations for the jury's silence on the homicide charge that was less in degree than that for which a conviction was obtained are quite different than the possible explanations for its silence on the charge that was greater in degree than that for which a conviction was obtained, see supra, p. 856. While the silence on the greater degree could be described as a failure to obtain a conviction, this description of the silence on the lesser charge (first degree manslaughter) would be entirely inappropriate; the conviction (for second degree murder) obtained made a conviction for a lesser degree of homicide entirely superfluous. The punishment for first degree manslaughter is no greater than that for second degree murder; and the elements of the latter crime includes, under the facts of this case, all those of the former. It would not be cruel or inhumane to subject the accused to reprosecution for first degree manslaughter if the State could, in the same circumstances, reprosecute him for a greater degree of homicide (second degree murder); and the risk of being reprosecuted for a charge that was lesser in degree than that for which a conviction was obtained would not put an unconscionable premium on successfully appealing the conviction
 
 
 [21]
 N.Y.Code of Criminal Procedure 464. 'Effect of granting new trial
 'The granting of a new trial places the parties in the same position as if no trial had been had. All the testimony must be produced anew; and the former verdict cannot be used or referred to, either in evidence or in argument.'
 
 
 [22]
 N.Y.Code of Criminal Procedure 544. 'New trial
 'When a new trial is ordered, it shall proceed in all respects as if no trial had been had.'
 
 
 [23]
 N.Y.Penal Law 32. 'Acquittal or conviction bars indictment for another degree
 'Where a prisoner is acquitted or convicted, upon an indictment for a crime consisting of different degrees, he cannot thereafter be indicted or tried for the same crime, in any other degree, nor for an attempt to commit the crime so charged, or any degree thereof.'
 
 
 [24]
 This is why certain commentators read Palko as permitting reprosecutions following a successful appeal by the State from an acquittal. See, e.g., Mr. Justice Frankfurter's parenthetical statement in Bartkus v. Illinois, supra, 359 U.S. at 131, 79 S.Ct. at 682. 'It is worth noting that Palko sustained a first degree murder conviction returned in a second trial after an appeal by the State from an acquittal of first degree murder.'
 
 
 [25]
 The opinion in brantley suggests, as a possible basis for distinction, that there the state reprosecution was challenged on the basis of the Fifth Amendment rather than the Due Process Clause of the Fourteenth Amendment: 'This writ of error was sued out, and plaintiff in error contended that the judgment of the supreme court of Georgia was in violation of the 5th Amendment of the Constitution of the United States * * *' 217 U.S. at 285, 30 S.Ct. at 515. However, this appears to be a misstatement of the Constitutional claim (perhaps reflecting of the mode of analysis discussed in the text infra). The brief for the plaintiff-in-error clearly frames the constitutional challenge to the reprosecution in terms of the Due Process Clause of the Fourteenth Amendment, and, in fact, the brief reads: 'It is not contended that the defendant is protected by * * * (the double jeopardy) clause of the Fifth Amendment * * *, for it is recognized that by a long line of decisions the first ten Amendments are not operative on the states' (pp. 2-3). Mr. Justice Frankfurter also interpreted Brantley as being 'concerned (with) the Due Process Clause,' Green v. United States, supra, 355 U.S. at 213, 78 S.Ct. at 236 and presumably he meant the Fourteenth Amendment's Due Process Clause
 
 
 [26]
 For the educative impact of Green, see, e.g., Gomez v. Superior Court, 50 Cal.2d 640, 328 P.2d 976 (1958); State v. Williams, 30 N.J. 105, 152 A.2d 9 (1959); State v. Schoel, 54 Wash.2d 388, 341 p.2d 481 (1959); reaching a similar result under state constitutions. Contrast, Blanton v. Commonwealth, 320 S.W.2d 626 (Ky.1958); State v. Thomas, 88 Ariz. 269, 356 P.2d 20 (1960). For the state law prior to Green, see generally, Annot. 61 A.L.R.2d 1141 (1958)
 
 
 [27]
 See, by way of illustration State v. Ross, 29 Mo. 32 (1859); State v. Tweedy, 11 Iowa 350, 357-358 (1860); State v. Dennison, 31 La.Ann. 847, 849 (1879); West v. State, 55 Fla. 200, 46 So. 93 (1908); People v. Gessinger, 238 Mich. 625, 628-629, 214 N.W. 184, 185 (1927), reaching similar results under state law. But compare, Slaughter v. State, 25 Tenn. (6 Humph.) 410 (1846) and State v. Belden, 33 Wis. 120 (1873)
 
 
 [28]
 On direct appeal from the judgment of conviction entered in the third trial, the Appellate Division declared, without any elaboration, that the verdict 'is amply supported by the evidence,' see supra, p. 848. It should be noted that under New York standards, even if the evidence is sufficient to support the verdict an error could nevertheless be prejudicial and thus require reversal, see the appeal from the judgment of conviction entered on the first trial, supra, p. 847