WOOD, Appellant v. JAMESON, Respondent

(130 N.W.2d 95)

(File No. 10104. Opinion filed August 26, 1964)

**James R. Adams,** Sioux Falls, for appellant.

**Frank L. Farrar,** Atty. Gen., **Walter W. Andre,** Asst. Atty. Gen., Pierre, for respondent.

ROBERTS, J.  Appellant Vincent L. Wood commenced this proceeding by filing an application for writ of habeas' corpus in the Circuit Court of Minnehaha County asserting that he is being unlawfully restrained of his liberty by the Warden of the South Dakota State Penitentiary by virtue of a judgment and sentence for a term of twenty years imposed upon him by the Circuit Court of Charles Mix County on December 13, 1955, for the crime of rape in the first degree.  Appellant is an Indian and is an enrolled member of the Yankton tribe of Sioux Indians.  The alleged crime was committed in a building on lots within the City of Lake Andes which were within the original exterior boundaries of the Yankton Indian reservation.  An abstract of title offered in evidence by appellant and received without objection shows a patent dated May 8, 1916, describing the land which included the lots here in question and reciting that an order of the Secretary of Interior had been deposited in the General Land Office directing that a "fee simple patent" issue to the grantee, a Yankton Sioux Indian, and a warranty deed dated June 4, 1917, to a townsite company which had the land included as an addition to the townsite of Lake Andes.  The controverted issue was whether the offense was committed in Indian country and thus within the exclusive jurisdiction of the federal courts.  Judgment was entered denying a writ and applicant has appealed.

■■ The federal courts have exclusive jurisdiction over certain enumerated crimes, including rape, committed by Indians in Indian country.  18 U.S.C.A. § 1153 (known as the "Ten Major Crimes Act").  "Indian country" is defined by the provisions of 18 U.S.C.A. § 1151 as follows: "Except as otherwise provided in sections 1154 and 1156 (not here pertinent) of this title, the term 'Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation   *   *   *."

■ On April 19, 1858, a treaty was made and concluded by Charles E. Mix, U. S. Commissioner of Indian Affairs, and chiefs and delegates of the Yankton tribe of Sioux Indians.  It was agreed

that four hundred thousand acres "situated and described as follows, to wit—Beginning at the mouth of the Naw-izi-wa-koo-pah or Chouteau River and extending up the Missouri River thirty miles; thence due north to a point; thence easterly to a point on the said Chouteau River; thence down said river to the place of beginning, so as to include the said quantity of four hundred thousand acres" be reserved for the use and occupancy of said Indians. 11 Stat. 743. Allotments in severalty were subsequently made to members of the tribe pursuant to Acts of Congress of February 8, 1887 (24 Stat. 388) and of February 28, 1891 (26 Stat. 794), the same being in small tracts scattered throughout the area. Perrin v. United States, 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691. The area thus reserved for the tribe was a legally constituted Indian reservation. In United States v. Celestine, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195, the court said: "when Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress." We then proceed to a consideration of the effect of a subsequent treaty and federal legislation providing for the opening of the reservation to settlement. By a treaty ratified and confirmed by Act of Congress of August 15, 1894 (28 Stat. 286), the Yankton tribe for an agreed consideration did "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said Indians as aforesaid." In Article VIII of the treaty it was stipulated: "Such part of the surplus lands hereby ceded and sold to the United States, as may now be occupied by the United States for agency, schools, and other purposes, shall be reserved from sale to settlers until they are no longer required for such purposes. But all other lands included in this sale shall, immediately after the ratification of this agreement by Congress, be offered for sale through the proper land office, to be disposed of under the existing land laws of the United States, to actual and bona fide settlers only." In the ratifying act it was provided "That the lands by said agreement ceded, to the United States shall, upon proclamation by the President, be opened to settlement, and shall be subject to disposal only under the homestead and town-site laws of the United States, excepting the sixteenth and thirty-sixth sec-

tions in each Congressional township, which shall be reserved for common-school purposes and be subject to the laws of the State of South Dakota". The ceded lands, excepting small tracts reserved for an Indian agency, Indian school and the like were on May 21, 1895, by presidential proclamation opened to settlement under the homestead and townsite laws. 29 Stat. 865. The the tract upon which the offense here involved was committed was a part of the land relinquished and conveyed and opened for settlement and as to which a patent was issued.

The court in United States v. Pelican, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676, 677, had under consideration an act (27 Stat. 62) providing for the opening of a part of the Colville Indian Reservation in the State of Washington to settlement. The Act provided that excepting certain tracts that had been allotted to Indians the portion of the reservation described therein was "vacated and restored to the public domain" and opened to settlement and entry under the general laws applicable to the disposition of public lands. The court in construing the Act said: "The exceptions were made by Congress in order to care for the Indians residing on that portion of the reservation. * * * The titles to the lands selected were to 'be held in trust for the benefit of the allottees, respectively, and afterwards conveyed in fee simple to the allottees or their heirs,' as provided in the acts of February 8, 1887 [c. 119], (24 Stat. at L. 388, Chap. 119), and February 28, 1891 [c. 38] (26 Stat. at L. 794, Chap. 383). * * * The evident purpose of Congress was to carve out of the portion of the reservation restored to the public domain the lands to be allotted and reserved, as stated, and to make the restoration effective only as to the residue. * * * Accordingly the President issued his proclamation on April 10, 1900, declaring that the restored portion of the reservation would be open to settlement and entry on October 10, 1900, and an appropriate clause was inserted which saved and excepted such tracts as had been or might be 'allotted to or reserved or selected for the Indians, or other purposes,' under the governing statutes." In the case of Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed. 2d 346, decided in 1961, the court refers to the portion of the reservation described in the Pelican case, supra, as the "North Half" of

the original Colville Reservation and the diminished reservation as the "South Half". Much reliance is placed by appellant upon this recent decision. Petitioner in that case imprisoned under a sentence for attempted burglary imposed by a state court sought release on habeas corpus on the ground that the state court had no jurisdiction because the place where the offense was alleged to have been committed was within the limits of an Indian reservation. The court in determining this issue whether the place where the crime occurred was in Indian country within the meaning of sections 1151 and 1153 supra, said:

"In 1892, the size of this reservation was diminished when Congress passed an Act providing that, subject to reservations and allotments made to individual Colville Indians, about one-half of the original Colville reservation, since commonly referred to as the 'North Half,' should be 'vacated and restored to the public domain* * * '. This Act did not, however, purport to affect the status of the remaining part of the reservation, since known as the 'South Half' or the 'diminished Colville Indian Reservation,' but instead expressly reaffirmed that this South Half was 'still reserved by the Government for their [the Colville Indians'] use and occupancy.' Since the burglary of which petitioner was convicted occurred on land within the South Half, it is clear that state jurisdiction over the offense charged, if it is to be found at all, must be based upon some federal action subsequent to the 1892 Act.

"The Washington courts found authority for the assertion of state jurisdiction in a 1906 Act of Congress implemented by a 1916 Presidential Proclamation. The 1906 Act provided for the sale of mineral lands and for the settlement and entry under the homestead laws of other surplus lands remaining on the diminished Colville Reservation after allotments were first made and patents issued for 80 acres of land to 'each man, woman, and child' either 'belonging to or having tribal relations on said Colville Indian Reservation * * *.' The 1916

Presidential Proclamation issued pursuant to this Act simply prescribed the method for disposal of surplus lands under the homestead laws as the 1906 Act had authorized. The Washington courts viewed this 1906 Act and the 1916 Presidential Proclamation as completely wiping out the South Half of the Colville Reservation in precisely the same manner as the 1892 Act had 'vacated and restored' the North Half of the reservation 'to the public domain.' Upon careful consideration, however, we cannot agree with that conclusion for it has no support in the language of the 1906 Act and ignores important differences between that Act and the provisions of the 1892 Act restoring the North Half of the reservation to the public domain.

"Nowhere in the 1906 Act is there to be found any language similar to that in the 1892 Act expressly vacating the South Half of the reservation and restoring that land to the public domain. Quite the contrary, the 1906 Act repeatedly refers to the Colville Reservation in a manner that makes it clear that the intention of Congress was that the reservation should continue to exist as such.

\* \* \* \* \*

"That this is the proper construction of the 1906 Act finds support in subsequent congressional treatment of the reservation. Time and time again in statutes enacted since 1906, Congress has explicitly recognized the continued existence as a federal Indian reservation of this South Half or diminished Colville Indian Reservation."

Federal enactments as to Indian reservations set apart within this state and the effect thereof with respect to state jurisdiction of crimes committed within the limits of an Indian reservation or on lands formerly a part thereof are referred to and considered in numerous decisions of this court, among them State v. Sauter, 48 S.D. 409, 205 N.W. 25; Application of DeMarrias, 77 S.D. 294, 91 N.W.2d 480; State ex rel. Hollow Horn Bear v. Jameson, 77 S.D. 527, 95 N.W.2d 181; State v. De Marrias, 79 S.D. 1,

107 N.W.2d 255, cert. den. 368 U.S. 844, 82 S.Ct. 72, 7 L.Ed.2d 42; Lafferty v. State, 80 S.D. 411, 125 N.W.2d 171. The situation in each of the cases cited differs from the case before us in that the size of an Indian reservation was by federal enactment diminished and the excluded portion opened for settlement.

■ The contention of counsel for appellant is in essence that the Act of 1894 (28 Stat. 286) did not disestablish the Yankton Indian Reservation, but in a manner similar to the Act of 1906 (34 Stat. 80) construed in the Seymour case provided for the sale of surplus lands that were to remain a part of the reservation. Construing the Indian treaty and the 1894 ratifying Act together we think that it was the purpose of Congress to disestablish the reservation and restore to the public domain the lands therein with the exception of allotments in severalty. Titles to the lands selected were to be held in trust for the benefit of the allottees and afterwards conveyed in fee simple as provided in the aforementioned Acts of February 8, 1887 and February 28, 1891. Section 6 of the 1887 Act provided: "That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside   *   *   *." We are not here concerned with an offense committed on a trust allotment. We do not regard the explicit provision in the same treaty prohibiting upon any of the lands ceded the sale or furnishing of intoxicating liquors to Indians as indicating a contrary intent. In Perrin v. United States, supra, the court held that when reasonably essential to the protection of Indians such a prohibition could be made to apply whether upon or off a reservation.

■ The offense not having been committed in "Indian country" as defined by section 1151, supra, the Circuit Court of Charles Mix County had jurisdiction of the prosecution for the offense committed by appellant. The judgment appealed from is affirmed.

All the Judges concur.