Clarence Ernest **BEARDSLEE**, a/k/a Clarence Everett Beardslee, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 18565.

United States Court of Appeals Eighth Circuit.

Dec. 21, 1967.

James S. Nelson, of Costello, Porter, Hill, Banks & Nelson, Rapid City, S. D., for appellant.

David V. Vrooman, Asst. U. S. Atty., Sioux Falls, S. D., for appellee; Harold C. Doyle, U. S. Atty., Gene R. Bushnell, Asst. U. S. Atty., and Ronald Clabaugh, Asst. U. S. Atty., were on the brief.

Before BLACKMUN, MEHAFFY and GIBSON, Circuit Judges.

BLACKMUN, Circuit Judge.

Clarence E. Beardslee stands convicted by a federal jury of the murders of his mother, Charlotte Marie Schaeffer, and his eleven-year-old halfbrother, Gregory Eugene Schaeffer, at Mission, South Dakota, in June 1965. Both verdicts, rendered July 29, 1966, found him guilty of murder in the first degree, in violation, as charged in the indictment, of 18 U.S.C. § 1153,[1] the so-called Ten Major Crimes Act, and § 1111.[2] The jury, however,

1. § 1153. Offenses committed within Indian country

Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

\* \* \* \* \*
(The corresponding venue statute is 18 U.S.C. § 3242).

2. § 1111. Murder
(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death

as § 1111(b) permits, qualified each verdict by adding to it the words "without capital punishment". The defendant thus escaped the death penalty which the statute otherwise imposes. He received the alternatively prescribed life sentence on each conviction. This in forma pauperis appeal followed.

Beardslee, born May 27, 1948, was 17 years of age at the time his mother and half-brother were killed. He had completed his freshman year of high school. He possesses one-eighth Indian blood and is an enrolled member of the Sioux Tribe, Rosebud Reservation, South Dakota. Although the point was suggested in a pretrial motion and ruled adversely to the defense, no issue is before us as to the defendant's status as an Indian, within the meaning of § 1153.

The indictment, filed August 20, 1965, is in two counts. The first charges that Beardslee, an Indian under the wardship of the United States, with premeditation and malice aforethought, murdered Mrs. Schaeffer, also a wardship Indian, "by means of shooting her with a rifle". The second identically charges Beardslee with the murder of Gregory "by stabbing him with a knife".

*The evidence.* The government's case was based upon circumstantial evidence and admissions. The bodies of Mrs. Schaeffer and Gregory were discovered in their house on the night of June 18, 1965. The woman had been killed by a 30.06 rifle bullet. Gregory had died from multiple knife wounds. A 30.06 caliber rifle was in the living room. Three blood stained knives were found, one next to Gregory, one on a table, and one on the kitchen sink. No latent fingerprints were on the rifle. The fragments of the bullet were too mutilated for a positive identification as having been shot from the rifle. Beardslee's fingerprints were on the knife found on the kitchen sink. The blood on the knife, however, could not be identified by group. A box of rifle shells was discovered hidden in the water tank of the lavatory. It contained 19 unused cartridges and the spent casing of one cartridge. That casing had been fired from the rifle. The kitchen wall clock was on the floor and had stopped at 3:43, indicating that the murders took place about that time on Friday morning, June 18.

Mrs. Schaeffer and Gregory had last been seen the night before. The defendant had been dropped off at the house about 9:30 p. m. on June 17. On the 18th he was seen at the Checkerboard Cafe in Mission at about 5:30 a. m. He was clean and well-groomed. He had his mother's car and purchased gasoline for it at six a. m., when the service station opened, and drove east out of town. The car was found abandoned on the highway later that morning. One license plate was bent over and the other was under the car. The defendant was arrested in Oklahoma on June 24 for a traffic violation while driving a car with Texas license plates.

One day in the latter part of May, 1965, the defendant had remarked in a conversation with a friend that he was going to kill his mother and halfbrother and burn the house down. In a letter to his aunt about that time he wrote that he would some day kill "that little bastard" Gregory. Three or four days before the killings the defendant had attempted to purchase rifle shells at a service station and one or two days before the killings he did purchase a box of twenty 30.06 caliber rifle shells from a lumber company in Mission. On June 18 the defendant telephoned long distance to a friend

of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto "without capital punishment", in which event he shall be sentenced to imprisonment for life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

of his aunt in New York State and indicated that he was in jail for murder and that he was going to turn himself in. A postcard written by Beardslee to an aunt sometime after June 18 reads: "Just like the T.V. show but I like it. The Fugitive. P. S. You won't ever see me again for about twenty years. Don't try. Don't show this to anyone". While in custody in the Deadwood, South Dakota, jail prior to trial the defendant threatened two other inmates with the statement, "I have killed two people already, and two more don't make that much difference to me".

This was the government's case.

Beardslee did not take the stand. The principal defense was insanity at the time of the killings. (Beardslee's competency to stand trial is not questioned). Testimony was introduced to the effect that the defendant was raised, for the most part, by his grandmother and aunt and was little cared for by his mother; that he had never known his father; that his mother was twice divorced; that she was a woman of loose morals; that she mistreated him and preferred Gregory to him; and that a short time before the killings he had witnessed his mother in bed having intercourse with a man. On the insanity issue the defense relies upon the testimony of Howard C. Wilinsky, M.D., then a staff psychiatrist at the United States medical center for federal prisoners at Springfield, Missouri. Beardslee had been sent to Springfield, pursuant to a defense motion under 18 U.S.C. § 4244, for an examination as to his competency to stand trial. Dr. Wilinsky testified that the defendant was competent to stand trial but, in his opinion, was not responsible for his actions on the night of the killings; that he was suffering an acute schizophrenic reaction; and that he was legally insane. The government countered with psychiatric opinion, on a hypothetical question, that the defendant was merely a psychopath who had stabbed a woman on a previous occasion and who was fully responsible for his actions.

*The issues.* These relate to federal jurisdiction; the trial court's instructions on degrees of murder and insanity; the court's refusal to limit the testimony of two government witnesses; and the court's comments on the evidence. The pertinent facts will be recited as these issues are respectively considered. No point is raised as to the sufficiency of the evidence or as to the identity of the defendant as the perpetrator of the homicides.

A. Jurisdiction. The threshold question of federal jurisdiction is posed by the defense position that the alleged crimes did not take place "within the Indian country", as is required for the application of § 1153, the exclusive federal jurisdiction statute set forth in pertinent part in footnote 1, supra. This necessary component of the crimes was submitted to the jury when it was instructed that, in passing on the innocence or guilt of the defendant, it must "decide the question whether or not the offenses were committed in Mission, Todd County, in the Rosebud Reservation of South Dakota". It was also submitted to the court on the defense's several motions to dismiss.

There is no dispute as to the facts which bear upon jurisdiction. The alleged offenses were committed within the original outer boundaries of the Rosebud Reservation but in a house on land then owned by non-Indians and rented to Mrs. Schaeffer by these non-Indian owners. The lot on which the house stands was part of an area which had been platted as an addition to the town of Mission in Todd County. The United States issued a patent for the land to an Indian allottee on July 5, 1912. This Indian title was thereafter extinguished by a conveyance to non-Indians in August 1959. The plat was dedicated September 1, 1959. Thus the site is within the reservation's outer boundaries but on platted land owned by a non-Indian.

"Indian country", as that term is employed in § 1153, is defined in 18 U.S.C.

§ 1151.[3] The definition of clause (a) of § 1151 would seem clearly to include the town of Mission, and the site of the alleged offenses, for it is "within the limits" of the Rosebud Reservation "notwithstanding the issuance of" the 1912 patent. The defense, however, pivots its jurisdictional argument on clause (c), which would include, within the definition of Indian country, "all Indian allotments, the Indian titles to which have not been extinguished". It is then urged that, by inference, an Indian title which has been extinguished is outside the definition.

We decide this issue against the defense. We do so in view of the following:

1. The Rosebud Reservation was established by, and is described in, § 2 of the Act of March 2, 1889, 25 Stat. 888. The boundaries of Todd County, in which the town of Mission is located, are laid down in S.D.Code, § 12.0162 (1939). All of Todd County is obviously within the original boundaries of the Rosebud Reservation. Only three Acts of Congress have affected the territory of the reservation since its establishment in 1889 and none of these concern Todd County. Act of April 23, 1904, 33 Stat. 254; Act of March 2, 1907, 34 Stat. 1230; Act of May 30, 1910, 36 Stat. 448. No part of the Todd County portion of the reservation has ever been formally opened. Instead, that portion has remained closed since 1889. The general geographical situation is thus clear.

2. The Supreme Court decisions seem clearly to indicate and favor federal jurisdiction. In United States v. Celestine, 215 U.S. 278, 285, 30 S.Ct. 93, 95, 54 L.Ed. 195 (1909), Mr. Justice Brewer,

a recognized authority on Indian affairs, observed, "[W]hen Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress". With this premise established, the Court found itself confronted, some 50 years later, with the case of Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), a habeas corpus proceeding by an Indian who was a state prisoner. He had pleaded guilty to a state charge and now challenged his conviction upon that plea because of a claimed absence of state court jurisdiction. His alleged offense took place in an area which, concededly, was part of a reservation created in 1872 but which was not in a portion restored by Congress to the public domain in 1892. However, the Act of March 22, 1906, 34 Stat. 80, implemented by a 1916 Presidential Proclamation, 39 Stat. 1778, provided for settlement and entry on surplus lands on the diminished reservation. Nevertheless, this was held by the Court not to wipe out the remainder of the reservation. Mr. Justice Black said, p. 355 of 368 U.S., p. 427 of 82 S.Ct., "Nowhere in the 1906 Act is there to be found any language similar to that in the 1892 Act expressly vacating the South Half of the reservation and restoring that land to the public domain". An alternative contention by the state that the land on which the attempted burglary occurred was within the governmental townsite, and thus outside Indian country, was rejected. Then, after quoting the above language from United States v. Celestine, the Court said, p. 359, 82 S.Ct. p. 429:

"We are unable to find where Congress has taken away from the Colville In-

---

3. § 1151. Indian country defined

Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the

United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
(The exceptions as to §§ 1154 and 1156 relate to intoxicants and have no pertinency here).

dians any part of the land within the boundaries of the area which has been recognized as their reservation since 1892. Since the burglary with which petitioner was charged occurred on property plainly located within the limits of that reservation, the courts of Washington had no jurisdiction to try him for that offense."

Similarly here, we find no legislation by which Congress has taken away from the Rosebud Sioux any part of the land of Todd County, all of which is within the boundaries of the area which has been recognized as their reservation since 1889.

The *Seymour* case similarly refused to embellish the words "notwithstanding the issuance of any patent" in § 1151(a) with a requirement that the patent be one issued to an Indian. An opposite holding, it was said, would result in "an impractical pattern of checkerboard jurisdiction * * * where the result would be merely to recreate confusion Congress specifically sought to avoid". P. 358 of 368 U.S., p. 428 of 82 S.Ct. See United States v. Frank Black Spotted Horse, 282. F. 349, 354 (D.S.D.1922).

■ 3. Federal jurisdiction is not present, of course, even though an Indian may be the defendant, where the offense site was never reservation land or is on a disestablished portion of a reservation, however that disestablishment may have been effected. This is the obvious inferential holding of *Seymour* and is the direct holding in the following cases, among others: De Marrias v. South Dakota, 319 F.2d 845 (8 Cir. 1963), affirming 206 F.Supp. 549 (D.S.D.1962); Ellis v. Page, 351 F.2d 250 (10 Cir. 1965); Tooisgah v. United States, 186 F.2d 93, 97–98 (10 Cir. 1950); Bird in the Ground v. District Court, 239 F.Supp. 981, 983–984 (D.Mont.1965). See United States v. La Plant, 200 F. 92, 93 (D.S.D.1911). The Supreme Court of South Dakota has so ruled repeatedly. State v. Sauter, 48 S.D. 409, 205 N.W. 25, 28 (1925); Appli-

cation of De Marrias, 77 S.D. 294, 91 N.W.2d 480 (1958); State ex rel. Hollow Horn Bear v. Jameson, 77 S.D. 527, 95 N.W.2d 181 (1959); State v. De Marrias, 79 S.D. 1, 107 N.W.2d 255 (1961), cert. denied 368 U.S. 844, 82 S.Ct. 72, 7 L.Ed.2d 42; Lafferty v. State ex rel. Jameson, 80 S.D. 411, 125 N.W.2d 171 (1963); Wood v. Jameson, 81 S.D. 12, 130 N.W.2d 95 (1964); State v. Barnes, 81 S.D. 511, 137 N.W.2d 683 (1965); State ex rel. Swift v. Erickson, S.D., 141 N.W.2d 1 (1966).

■ 4. Other courts almost uniformly have upheld federal jurisdiction or denied state jurisdiction, where the offense was committed by an Indian within the boundaries of a reservation but on particular land not owned by an Indian. Disestablishment thus is not effected by an allotment to an Indian or by conveyance of the Indian title to a non-Indian. Hilderbrand v. United States, 287 F.2d 886 (10 Cir. 1961), affirming 190 F. Supp. 283, 285–287 (D.Kan.1960), cert. denied 366 U.S. 932, 81 S.Ct. 1655, 6 L. Ed.2d 391; Hilderbrand v. Taylor, 327 F.2d 205 (10 Cir. 1964); Williams v. United States, 215 F.2d 1 (9 Cir. 1954), cert. denied 348 U.S. 938, 75 S.Ct. 338, 99 L.Ed. 735; Guith v. United States, 230 F.2d 481 (9 Cir. 1956); In the Matter of High Pine, 78 S.D. 121, 99 N.W.2d 38 (1959); In re Hankins' Petition, 80 S.D. 435, 125 N.W.2d 839 (1964); State v. Lussier, 269 Minn. 176, 130 N.W.2d 484, 488 (1964); State ex rel. Irvine v. District Court, 125 Mont. 398, 239 P.2d 272 (1951); Application of Andy, 49 Wash. 2d 449, 302 P.2d 963 (1956); Hatten v. Hudspeth, 99 F.2d 501 (10 Cir. 1938); Davis v. Johnston, 144 F.2d 862 (9 Cir. 1944), cert. denied 323 U.S. 789, 65 S.Ct. 311, 89 L.Ed. 629. See Smith v. Temple, S.D., 152 N.W.2d 547, 548 (1967). See also the civil cases of Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), and Smith v. Temple, supra, 152 N.W.2d 547, where the effect of Article VI § 20 of the South Dakota Constitution[4] was considered. Chief

4. § 20. All courts shall be open, and every man for an injury done him in his property, person or reputation, shall have remedy by due course of law, and right and justice, administered without denial or delay.

Judge Murrah said it well when he observed,

"[T]he allotment of lands in severalty or the conveyance of land to non-Indians did not operate to disestablish the reservation or create a state jurisdictional enclave within the limits of the reservation". Ellis v. Page, supra, p. 252 of 351 F.2d.[5]

5. Although a different and now obsolete statute was involved, this court in effect decided this issue in Kills Plenty v. United States, 133 F.2d 292 (8 Cir. 1943), cert. denied 319 U.S. 759, 63 S.Ct. 1172, 87 L.Ed. 1711, a case concerning, coincidentally enough, an offense within the original boundaries of the Rosebud Reservation but in the townsite of Mission and "not on Indian lands". The governing statute was § 329 of the old criminal code, then 18 U.S.C. § 549. This former § 549 was not restricted in its application, as the present § 1153 is, to an Indian defendant, but applied instead to "any person" charged with one of the specified major crimes "committed within the limits of any Indian reservation in the State of South Dakota". This court recognized that various then existing Indian statutes might have different meanings and consequences, citing the result reached in State v. Johnson, 212 Wis. 301, 249 N.W. 284 (1933). This court's attitude, however, is apparent from Judge John B. Sanborn's comment at p. 295 of 133 F.2d:

"We think that, unquestionably, it was the intention of the State of South Dakota, in 1901, to cede to the United States jurisdiction to deal with certain criminal offenses committed within the territorial limits of the Indian reservations in that State so long as they remained Indian reservations, and that it was the intention of the United States, in 1903 and thereafter, to assume and exercise that jurisdiction with respect to the crimes enumerated in § 549, Tit. 18 U.S.C.A. We regard the contention that the State of South Dakota was without authority to cede such jurisdiction to the United States with respect to patented lands within the limits of Indian reservations as without merit."

6. Finally, we are not persuaded by the defense arguments that clause (c) of § 1151 is significant in the present factual context; that it carries a necessary inference that, where the title to an Indian allotment has been extinguished, as was the case with respect to the house and lot Mrs. Schaeffer was renting, the property no longer is Indian country; and that Seymour and Kills Plenty are distinguishable because they do not apply the definition of Indian country contained in § 1151(c). Clause (c) came into the statute as the result of the holding in United States v. Pelican, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1942), namely, that lands allotted to Indians remained within the definition of Indian country even though the rest of the reservation was opened to settlement. See Reviser's Note following 18 U.S.C.A. § 1151 (1966), and 80th Congress House Report No. 304. Clause (c) is an addition to and not a limitation upon the definition of Indian country embraced in the preceding portions of § 1151. We regard clause (c) as applying to allotted Indian lands in territory now open and not as something which restricts the plain meaning of clause (a)'s phrase "notwithstanding the issuance of any patent". Although this result tends to produce some checkerboarding in non-reservation land, it is temporary and lasts only until the Indian title is extinguished. The congressional purpose and intent seem to be clear. See State ex rel. Hollow Horn Bear v. Jameson, supra, pp. 184–185 of 95 N.W.2d.

---

5. For the rather special situation in South Dakota, not of importance here, relating to jurisdiction over crimes committed by a non-Indian on reservation land, see S.D. Constitution, Article XXII, Second, and Article XXVI, § 18, Second; S.D.Code § 34.0502 (Supp.1960); Act of February 14, 1901, Session Laws S.D.1901, p. 132, ch. 106; Act of February 2, 1903, 32 Stat. 793, codified as the former 18 U.S.C. § 549; Kills Plenty v. United States, 133 F.2d 292 (8 Cir. 1943), cert. denied 319 U.S. 759, 63 S.Ct. 1172, 87 L. Ed. 1711; and many of the South Dakota cases cited in the body of this opinion.

288

█ We therefore conclude, and without particular difficulty, that federal jurisdiction over the offenses charged here has been established and is exclusive. In summary: The site is within the original boundaries of the Rosebud Reservation. The Todd County portion remains closed. Neither the platting nor the extinguishment of the Indian allotment title of 1912 take the site outside Indian country. Clause (c) is an addition to, not a subtraction from, the statutory definition.

**B. The trial court's instructions on first degree murder.**

█ The court first read to the jury the two counts of the indictment and then gave the customary precaution that the indictment is not evidence and creates no presumption or inference of guilt. It then turned to § 1111(a) and gave the first degree instruction which we set out by way of footnote.[6] All this is obviously taken from Mathes and Devitt, Federal Jury Practice and Instructions, § 38.02 to .06 (1965).

The defense asserts that this instruction was basic error and that the error was compounded by the Court's failure to give the first degree murder instruction which the defense proffered.[7] It is

---

**6.** "Section 1111, Title 18, of the United States Code, as amended, declares that 'Murder is the unlawful killing of a human being with malice aforethought.' Two essential elements are required to be proved in order to establish the offense of first degree murder under each of the two counts charged in the indictments: first, the act or acts of killing Charlotte Marie Schaeffer as charged in the first count of the indictment and, second, doing such act or acts unlawfully and with malice aforethought, and identical proof of the same elements as the defendant, under Count 2 of the indictment, is charged with first degree murder of Gregory Eugene Schaeffer.

"(6) 'Malice aforethought' may be manifested by wilfully doing an unlawful act. Malice is but another name for a certain state or condition of a person's mind or heart. Since no one can look into the heart or mind of another, the only means of determining whether or not malice existed at the time of the killing is by inference drawn from the surrounding facts and circumstances, as shown by the evidence in the case. Malice, as the term is used here, does not necessarily imply any ill will, spite, or hatred towards the individual killed, but does imply an intent wilfully to take the life of a human being. 'Malice aforethought' requires premeditation, which is a period of time to deliberate or think a matter over, before acting. The necessary duration of that period cannot be arbitrarily fixed. The time required to form a deliberate plan or design varies as the minds and temperaments of human beings differ, and according to the surrounding circumstances in which they may be placed. Any interval of time between the forming of the specific intent to kill, and the execution of the intent, which is of sufficient duration for the accused to be fully conscious and mindful of what he intended wilfully to set about to do, is sufficient to warrant a finding of premeditation.

"In determining whether Charlotte Marie Schaeffer and Gregory Eugene Schaeffer, either or both, were unlawfully killed with malice aforethought, the jury should consider all the facts and circumstances preceding, surrounding and following the killing, as shown by the evidence in the case, which tend to shed light upon the condition of mind and heart of the killer, at the time of the deeds. No fact, no matter how small, no circumstance, no matter how trivial, which bears upon the questions of malice, and premeditation, should escape careful consideration by the jury.

"(7) Section 1111, Title 18, United States Code, further provides that:

" 'Every murder perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree. Any other murder is murder in the second degree.'

"So, murder which is perpetrated by any kind of wilful killing, with malice aforethought, is murder in the first degree. * * *"

**7.** "In order to establish the offense of first degree murder as charged as to either counts, the evidence must show beyond a reasonable doubt that: (1) The defendant committed the alleged act with malice aforethought. That is, committed the

argued that the instruction as given told the jury that there were only two elements in first degree murder, namely, the act of killing and the doing of such act with malice aforethought; that, however, there is a third essential and distinct element, namely, premeditation; that the court failed to instruct as to this; that, as a consequence, the defendant was prejudiced because it was then easier for the jury to find him guilty of first degree murder; that, although the court did read all of § 1111(a) to the jury, a raw statute is meaningless and nearly impossible for lay jurors to understand; that the reading of the statute did not cure the defective instruction; that the court's inclusion of premeditation as a part of the definition of malice aforethought amounted to saying that malice aforethought and premeditation are one and the same thing; that they are not synonymous; that premeditation was charged in both counts of the indictment and was argued by the United States attorney to the jury and yet the court did not instruct that it was an element of the crime; and that the most that can be said about the instruction is that it was ambiguous and not understandable.

The defense rests its argument primarily on the case of Ornelas v. United States, 236 F.2d 392, 394 (9 Cir. 1956). There, confronted in a § 2255 proceeding with a restrictively drawn indictment, the court observed that the terms "premeditation" and "malice aforethought" are not synonymous.

In the present context we do not disagree with this observation. We fail, however, to see how it is of assistance to the defense on the first degree aspect of the present instructions.

What is important here are the first sentence and parts of the second sentence of § 1111(a), namely,

> "Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by * * any * * * kind of willful, deliberate, malicious, and premeditated killing * * * is murder in the first degree."

Clearly, under the first sentence of § 1111(a), malice aforethought is a necessary factor in the federal crime of murder. And clearly, murder by premeditated killing is, under the second sentence, first degree murder. Thus, a charge which, for first degree murder, requires the two elements of killing and malice aforethought and, as a part of the latter, premeditation, meets and fulfills both sentences of the statute and is not thereby prejudicial.[8]

We have read and deliberated upon the trial court's first degree murder instruction with care and in its entirety and we fail to perceive the error which the defense asserts. It is true that the court emphasized that there were "two essential elements" and that these were the killing and the doing of that act "unlawfully and with malice aforethought". This, however, is the exact content of the first sentence of § 1111(a). To that point the court was following the statute precisely. It went on, however, just as the statute goes on. It emphasized that malice aforethought "may be manifested by wilfully doing any unlawful act"; that malice "does imply an intent wilfully to take the life of a human being"; that malice aforethought "requires premeditation, which is a period of time to deliberate, or think a matter over, before acting"; and that "no matter how small

wrongful act without just cause with a willful intention and with an evil or deliberate design, and (2) willfully, maliciously, deliberately and premeditatedly committed the alleged act. That is, committed the alleged act intentionally after a period of deliberation."

8. It must be understood that what we say here is said in context. Whether pre-

meditation is an essential element of first degree murder under the succeeding phrase of § 1111(a), relating to murder committed in the perpetration of another crime, is an issue we do not pass upon here.

* * * which bears upon the questions of malice, and premeditation, should escape careful consideration". Also, § 1111 (a) was read in its entirety, although in two segments, the first consisting of its first sentence and the second of the remainder of the section.

We think that what the defense argument comes down to is that the instructions were erroneous because, on the facts here, they imposed only two elements and made premeditation a subpart of the second element of malice aforethought, rather than listing the essential elements as three in number, namely, the killing, malice aforethought, and premeditation. This, it seems to us, is a distinction without a difference.

It would, of course, not have been error for the trial court to instruct that there were three essentials, rather than two. We feel, however, that it did no less than this when it clearly and positively made premeditation an essential element of malice aforethought. It did this in its own words, which we have quoted above, and it did this, too, in its reading of the indictment with the specific charges of killing "with premeditation and malice aforethought", and with its reading of § 1111(a). It did not make the one synonymous with the other and thereby come in conflict with what was said in *Ornelas*. Neither did it charge that, without premeditation, the defendant could be convicted of first degree murder. Premeditation was spelled out as an essential. Thus, all that was contained in the alternative instruction proposed by the defense was covered in the instructions given by the court.

We therefore perceive no error in the first degree murder aspect of the court's charge. Further, we cannot assume that the jury was not intelligent enough to be aware of the essentials of the crime under the instruction as given.

C. The court's instruction on second degree murder.

This issue causes us far more difficulty. Concluding the first degree instruction, set forth in footnote 6, the court went on:

"So, murder which is perpetrated by any kind of wilful killing, with malice aforethought, is murder in the first degree. But if done without malice aforethought, that is to say, without the wilful and malicious and premeditated intent to take life, which is an essential element of first-degree murder, then the offense is murder in the second degree."

This, too, is obviously taken from Mathes and Devitt, Federal Jury Practice and Instructions, § 38.06 (1965).

The defense objected on the ground that the instruction was to the effect that second degree murder is a willful killing without malice aforethought and made it indistinguishable from first degree [voluntary] manslaughter [as defined in 18 U.S.C. § 1112(a)].[9] An instruction proposed by the defense would have required, for second degree murder, malice aforethought but "without deliberation or premeditation". It is argued that the jury was not given the opportunity to convict the defendant of the lesser crime of second degree murder but was restricted, on a conviction choice, to first degree murder and voluntary manslaughter.

There is, we think, a good bit of merit in this contention. Section 1111(a) is clear and positive when it says that "murder" (not first degree murder alone) is the unlawful killing of a human being "with malice aforethought". It is murder which is so defined. The statute then goes on to define murder in the first degree and concludes by stating, "Any other murder is murder in the second degree". Second degree murder is still murder which has been defined as unlawful homicide "with malice aforethought".

---

9. § 1112. Manslaughter
 (a) Manslaughter is the unlawful killing of a human being without malice.

It is of two kinds: Voluntary—upon a sudden quarrel or heat of passion.
 * * * * . *

Generally, that which distinguishes first from second degree murder is the presence in the former of premeditation. Hiatt v. Brown, 175 F.2d 273, 277, note 3 (5 Cir. 1949), reversed on other grounds, 339 U.S. 103, 70 S.Ct. 495, 94 L.Ed. 691 (1950); 40 C.J.S. Homicide § 35(d), p. 895; 26 Am.Jur., Homicide, § 38, p. 181. Malice aforethought, on the other hand, is usually considered as the element which distinguishes murder, in whatever degree, from manslaughter. Government of the Virgin Islands v. Lake, 362 F.2d 770, 774 (3 Cir. 1966); Wakaksan v. United States, 367 F.2d 639, 645 (8 Cir. 1966), cert. denied 386 U.S. 994, 87 S.Ct. 1312, 18 L.Ed.2d 341; Stevenson v. United States, 162 U.S. 313, 320, 16 S.Ct. 839, 40 L.Ed. 980 (1896). At common law there were no degrees of murder. A killing with malice aforethought was murder and a killing without malice aforethought was manslaughter. Fisher v. United States, 328 U.S. 463, 472–473, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946). It has been said that, when murder is divided into degrees by statute, express malice is required for murder in the first degree and implied malice is sufficient for murder in the second degree. See Lee v. United States, 72 App.D.C. 147, 112 F.2d 46, 48, note 2 (1940). Perhaps considerations of this kind led Mathes and Devitt and the trial court to the formulation of the instruction employed. Nevertheless, under § 1111(a), malice aforethought is required for both first and second degree murder and malice aforethought and premeditation are not synonymous. The statute and its wording cannot be escaped.

The government argues that, although a "casual reading" of the statute "might lead one to believe that the instructions were incorrect", they were taken from the Mathes and Devitt work; that, if malice aforethought includes premeditation, then malice aforethought is not an element of second degree murder and that this is precisely and only what the trial court instructed.

We are not convinced by the government's argument and suspect that it founders on its premise that under § 1111 (a) malice aforethought includes premeditation. It may, but it also may not. Whatever the situation may be under other statutes in this area of closely and technically defined criminal offenses, we cannot escape the plain language of § 1111(a) or the conclusion that, under this applicable and controlling federal statute, malice aforethought is an essential element of murder in the second degree as well as of murder in the first degree.

In Ornelas v. United States, supra, p. 394 of 236 F.2d, the Ninth Circuit said flatly that the first sentence of § 1111 (a) defining murder as "the unlawful killing of a human being with malice aforethought" is "as much applicable to second degree murder as first degree murder". We must agree. See Green v. United States, 355 U.S. 184, 190, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), and Government of the Virgin Islands v. Lake, supra, p. 774 of 362 F.2d, commenting on essentially identical statutes and Judge W. J. Campbell's charge reported at 4 F.R.D. 392, 395. See, also, Fisher v. United States, supra.

We realize that it is not without embarrassment to both the trial court and to us when we hold erroneous an instruction set forth as a model in so excellent a work, and one so well accepted, as the Mathes and Devitt volume on Federal Jury Practice and Instructions. We feel, however, that we are right in the conclusion we have reached. We observe, incidentally, that the cases cited by the authors in support of their § 38.06 do not, as we read them, lend foundation for the proposition that a murder done without malice aforethought is murder in the second degree. The trial court's charge under consideration in Fisher v. United States, supra, see footnote 3, p. 469 of 328 U.S., p. 1321 of 66 S.Ct., clearly prescribed malice as "a basic element of murder in both the first and the second degrees" in the District of Columbia. Faust v. North Carolina, 307 F.2d 869 (4 Cir. 1962), cert. denied 371 U.S. 964, 83 S.Ct. 547, 9 L.Ed.2d 511, concerned a state conviction; the North Carolina law

enunciated in the state appeal, State v. Faust, 254 N.C. 101, 118 S.E.2d 769, 772, 96 A.L.R.2d 1422 (1961), reveals that malice is an essential of second degree murder. Hansborough v. United States, 113 U.S.App.D.C. 392, 308 F.2d 645 (1962), also concerned the District of Columbia statute, and the court, in speaking of second degree murder, stated p. 647, that it must "result from a willful and malicious act". The same thing may be said of Lee v. United States, supra, p. 48 of 112 F.2d.

▉▉▉▉ We have no alternative than to conclude that the trial court's instruction here to the contrary, namely, that if murder is "done without malice aforethought" (although embellished with the phrase, "that is to say, without the willful and malicious and premeditated intent to take life"), it "is murder in the second degree", is inconsistent with the statute and is error.

▉▉▉▉ The question, then, is whether this error is prejudicial to the defendant. In this connection, we note that the trial court gave the jury lesser offense instructions as to second degree murder (as it had defined it) and voluntary manslaughter. If, under the evidence, these lesser included offense instructions need not have been given, the fact they were given could not possibly have been prejudicial to the defendant even though there was error in the definition of second degree murder. Thus, if the evidence justified only a conviction of murder in the first degree, on the one hand, or an acquittal, on the other, the error in the second degree murder instruction and the fact of giving that instruction were not prejudicial. The defense had proposed lesser included offense instructions as to second degree murder, voluntary manslaughter, and involuntary manslaughter.

The government argues that any error in the second degree murder instruction was, indeed, harmless; that the defense sought to dispute premeditation only with evidence of insanity; that insanity is a complete defense to any crime which involves intent as a necessary element; that insanity therefore does not support an instruction as to any lesser included offense; that the defendant's admissions clearly demonstrate premeditation, are corroborated by the physical evidence, and eliminate the possibility of second degree murder or voluntary manslaughter; and that the trial court gave the lesser included offense instructions only out of an abundance of caution.

The applicable standard was recently set out by the Supreme Court in the income tax evasion case of Sansone v. United States, 380 U.S. 343, 349–350, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965), affirming 334 F.2d 287, 294–295 (8 Cir. 1964). The Court stated:

"Thus, '[i]n a case where some of the elements of the crime charged themselves constitute a lesser crime, the defendant, if the evidence justifie[s] it * * * [is] entitled to an instruction which would permit a finding of guilt of the lesser offense.' * * * But a lesser-offense charge is not proper where, on the evidence presented, the factual issues to be resolved by the jury are the same as to both the lesser and greater offenses. * * * In other words, the lesser offense must be included within but not, on the facts of the case, be completely encompassed by the greater. A lesser-included offense instruction is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense."

See Driscoll v. United States, 356 F.2d 324, 327 (1 Cir. 1966), petition for certiorari pending.

▉▉▉▉ Here, the charged offense was first degree murder. The lesser offense of second degree murder does not require a finding of premeditation but does require a finding of malice. The even lesser included offense of manslaughter requires a finding of killing upon sudden quarrel or heat of passion but does not require either premeditation or malice.

 Although the evidence here was sufficient to support a verdict of first degree murder on either count, the question is whether part of that same evidence could have justified a verdict of second degree murder or voluntary manslaughter. See Arpan v. United States, 260 F.2d 649, 659, 660 (8 Cir. 1958). We conclude that it could. The government's case, as noted, was strong but circumstantial. The admissions by the appellant after the crime permit but do not require that there be a finding of malice. There was evidence of malice, it is true. There was also some expert opinion that the defendant may have acted out of heat of passion. Thus, whether the defendant killed premeditatively or with malice were questions for the jury. We have recognized the possibility of second degree or manslaughter verdicts in cases which, on their general facts, are not dissimilar to this one. Arpan v. United States, supra; Roberts v. United States, 332 F.2d 892 (8 Cir. 1964), affirming 223 F.Supp. 49, 55 (E.D.Ark. 1965), cert. denied 380 U.S. 980, 85 S.Ct. 1344, 14 L.Ed.2d 274.

We hold, although with some reluctance and with full awareness of a new trial's difficulties, expense and tribulations for all concerned, that the error in the second degree murder instruction was prejudicial to the defendant and that his convictions on both counts must be reversed.

Because the remaining issues raised by the defendant on this appeal are likely to appear again on the new trial, we deem it appropriate briefly to discuss them.

D. The court's instructions on insanity as a defense. With insanity suggested and in issue, the court advised the jury that the usual presumption of sanity ceased to exist and that it was for the government to prove, beyond a reasonable doubt, the defendant's sanity as of the time of the offenses. (Dusky v. United States, 295 F.2d 743, 754 (8 Cir. 1961), cert. denied 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536). The court then instructed as to insanity and the critical time period here.[10]

1. Temporary insanity. The defense complains, first, that the court failed adequately to instruct on temporary insanity. It had requested an instruction that "Temporary insanity, as well as insanity of longer duration, is recognized by the law" and that, if the accused was insane at the time of the alleged offenses, he should be acquitted "even though it may appear that he was sane at early and later times".

 Temporary insanity is, of course, recognized by the law, for the test of sanity is directed toward mental responsibility at the very time of the alleged criminal act. Thus, evidence as to an accused's mental condition, before or after the offense, if not unreasonably far removed in time, is usually admissible because it is relevant to the question of mental condition at the time of the offense. The court in its instructions in the present case did not state in so many words that temporary insanity was recognized. However, it focused the sanity issue upon a four hour period on June 18, 1965, and thus clearly implied the possibility of short duration or temporary

---

10. "* * * Here, as you will have noticed from the testimony, the existence of sanity is limited to two hours or thereabouts before and a like period after the crimes under a background described and relied on by Dr. Wilinsky, thus leaving it to you to decide whether or not the defendant during that limited period was insane, insanity for this purpose being defined, and as it is to be regarded by you, as a perverted and deranged condition of a person's mental and moral faculties as to render him either incapable of distinguishing between right and wrong, or incapable of knowing the nature of the act he is committing, or even where he is conscious of the nature of such act and able to distinguish between right and wrong, and knows that the act is wrong, yet his will—the governing power of his mind—has been so completely destroyed that his actions are not subject to it, but are beyond his control."

insanity. In view of this, we certainly cannot say that the failure to give the defense's proffered specific instruction on temporary insanity was error.

2 and 3. The test of insanity and the court's limitation of expert opinion on the insanity issue. These two complaints coalesce. The trial court sustained the government's objections to questions by the defense to its expert, Dr. Howard C. Wilinsky. These questions were whether the defendant's acts were "the product of mental disease or mental defect" and whether he could "conform his conduct to the requirements of the law". The inquiries thus relate to the insanity standards enunciated, respectively, in Durham v. United States, 214 F.2d 862, 874–875 (D.C.Cir. 1954), and United States v. Currens, 290 F.2d 751, 774 (3 Cir. 1961). The defense also requested an instruction along these lines but it was rejected by the trial court.

This court has consistently refused to adopt the "product of mental disease or mental defect" standard, first enunciated a century ago in New Hampshire, State v. Pike, 49 N.H. 399 (1870), and then adopted for the District of Columbia in Durham. Voss v. United States, 259 F.2d 699, 703 (8 Cir. 1958); Dusky v. United States, 271 F.2d 385, 401 (8 Cir. 1959), reversed on other grounds, 362 U.S. 402; Dusky v. United States, supra, 295 F.2d 743, 759 (8 Cir. 1961), cert. denied 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed. 2d 536; Feguer v. United States, 302 F.2d 214, 243 (8 Cir. 1962), cert. denied 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110; Carter v. United States, 332 F.2d 728, 729 (8 Cir. 1964), cert. denied 379 U.S. 841, 85 S.Ct. 79, 13 L.Ed.2d 47; Pope v. United States, 372 F.2d 710, 733–734 (8 Cir. 1967), petition for certiorari pending. And in the last cited case, footnote 8, pp. 734–735 of 372 F.2d, we noted what we felt was "the metamorphosis in the District of Columbia Circuit, from the former rigidities of the disease-product test to the standard of capacity for control as prescribed by" McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962).

In *Pope,* where we sat en banc, after making what we thought was a comprehensive review of the opinions on this subject from all the other federal circuits, (see, in particular, our Appendix set forth on pp. 737–39 of 372 F.2d), and after noting our expressions in the second *Dusky,* p. 759 of 295 F.2d, and in *Feguer,* pp. 244–245 of 302 F.2d, that we would hesitate to reverse, on claimed instructional error, where the trial court has used instructions which appropriately embrace cognition, volition, and capacity to control "whether based theoretically on a *M'Naghten* variation or on the test set forth in the Modern Penal Code proposed by the American Law Institute or on that form revised as suggested by the Third Circuit in *Currens,* or whether couched in still other language", we said specifically, p. 736 of 372 F.2d,

> "We hold again, and we stress by repetition, that if the trial court freely admits all evidence which appears to be relevant and *if the charge appropriately embraces and requires positive conclusions by the jury as to the defendant's cognition, his volition, and his capacity to control his behavior, and if these three elements of knowledge, will and choice are emphasized in the charge as essential and critical constituents of legal sanity, we shall usually regard the charge as legally sufficient.* And we also repeat what we said in *Feguer,* at p. 245 of 302 F.2d, and in the second *Dusky,* at p. 759 of 295 F.2d, namely, that we think this approach is sound because it preserves and builds upon those elements of *M'Naghten* and of lack of control which are acceptable in the present day, and yet modernizes them in terms which the jury can grasp and intelligently apply."

■ Here, the trial court's charge, footnote 10, although not long or involved, does appear to us to embrace and require positive findings on the part of the jury as to the defendant's cognition, his volition, and his capacity to control his behavior. We feel, too, that these three elements were emphasized as essen-

tial and critical constituents of legal sanity. Therefore, in line with the rule we have enunciated, we conclude that this aspect of the charge was legally sufficient.

Our opinion in the *Pope* case, however came down after the present defendant's trial in the district court. As a consequence, the trial judge was not aware of our broad approach, there announced, to the issue of relevancy of testimony relating to mental competency. We said, pp. 736–737 of 372 F.2d,

> "By way of addendum, we state that we expect a trial judge, in a case involving criminal responsibility, to be free in his admission of all possibly relevant evidence, to be imaginative in his charge, and to give appropriate and particular stress to the requirements of cognition, volition and capacity to control, rather than to be content with the bare bones of a traditional charge, even though it has been specifically approved by appellate opinion in the past. If this is done, effective and appropriate justice will be dispensed to the defendant who sincerely asserts legal insanity as his defense, and it will be accomplished with responsible judicial participation in each day's advance and contribution to our knowledge of the human mind."

It is apparent, we think, from all this that there is no "proper test" for insanity in this circuit if, by that, one means a "model charge". We have defined what we feel are the proper standards to be used in jury instructions but we have purposely refrained from the formulation of precise and governing words. The ultimate jury question is whether the defendant was sane within the definition to be given by the court. Sanity is to be decided by the jury, not by expert witnesses. But the opinion of experts in this area may well be relevant evidence, is usually not to be limited by legal technicality, and is not to be restricted artificially.

We are not convinced that the court's limiting of Dr. Wilinsky's testimony would, in itself, constitute reversible error. After all, the doctor did testify that in his opinion the defendant, at the time of the alleged offenses, did not know that the acts he was committing were wrong; that he did not know the actual nature and quality of his actions; that he was not able to exert control over his behavior; and that he was insane. The court's restriction on his further testimony, therefore and obviously, was not too significant. However, in view of what we said in *Pope*, we would favor on a new trial the admission of that portion of Dr. Wilinsky's testimony which was excluded at the first trial. The jury's determination of the issue of insanity would, of course, still be made under and upon appropriate instructions by the trial court.

If the long-pending petition for certiorari in the *Pope* case is eventually granted and if the case comes to be reversed by the Supreme Court on the issue of proper sanity standards, the trial court on the new trial will be guided accordingly. We suspect, but do not know, that the absence of action to this date on the petition is attributable to the Court's having noted, 387 U.S. 929, 87 S.Ct. 2050, 18 L. Ed.2d 989, probable jurisdiction in United States v. Jackson, 262 F.Supp. 716 (D. Conn. 1967). We understand that that case has now been argued. Decision therein is thus soon to be anticipated.

E. The court's refusal to limit the testimony of two government witnesses.

This testimony relates to admissions made by the defendant while in jail at Deadwood, South Dakota, in February 1966, eight months after the homicides. The government witnesses, David Perli, age 17, and Lee Engeberg, age 27, had been arrested on charges of public intoxication. They were detained in a room where the defendant and another were present. They testified that the defendant taunted and threatened them; that he used words such as "Perli looked awful good to him, and he liked young stuff"; that he actually attacked Perli and ripped his shirt; and that the defendant said, "I have killed two people already, and two

more don't make that much difference to me." The government desired this testimony because of the admission. It is claimed that the reference to the homosexual advance was necessary background.

■ The prosecution had notified defense counsel, after the trial began, of its intention to use these two witnesses. After interviewing them the defense moved in chambers to restrict their testimony to the admission on the ground that the threats and alleged attack were immaterial and irrelevant to the issue of guilt of the crimes charged in the indictment. The trial court denied this motion. The defense before us makes no complaint about the admission but does complain bitterly of the homosexual material. It relies on the rule that evidence of other crimes is usually not admissible. Such evidence, however, is not improperly admitted when, for example, it appropriately bears on the issue of intent or prior relationship between parties, Wakaksan v. United States, supra, p. 645 of 367 F.2d; Love v. United States, 386 F.2d 260 (8 Cir. 1967), or where it is particularly probative on certain other relevant factors. See Spencer v. State of Texas, 385 U.S. 554, 560–561, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967), and cases cited.

■ It is hardly to be doubted that in our present society testimony as to homosexual acts is damaging. See People v. Giani, 145 Cal.App.2d 539, 302 P. 2d 813 (1956). The prosecution here not only specifically elicited the testimony but referred to the homosexual implication in its closing argument. Usually, of course, a matter of this kind rests within the province of the trial court's discretion. Cotton v. United States, 361 F.2d 673, 676 (8 Cir. 1966); Skogen v. Dow Chemical Co., 375 F.2d 692, 704 (8 Cir. 1967). We feel, however, that the present situation is one where the testimony of these two witnesses could be appropriately restricted to eliminate the homosexual material without violation of any principle of verbal completeness, see 7 Wigmore, Evidence, §§ 2115, 2094 (3d

ed. 1940), and that, if this is done on the new trial, error is less likely to occur and fairness more likely to be achieved thereby.

F. The court's comments upon and summation of the evidence.

The complaint here is that the court summarized only evidence of the government; that it failed to review and summarize evidence favorable to the defendant; that it failed particularly to review the evidence on the issue of insanity; that it used language which could only be interpreted as an appeal to the passions of the jurors and thus acted as an advocate; and that the court's attitude was known from conferences in chambers. The government's response is that the defendant's killing of his mother and halfbrother is admitted; that the only defense asserted was insanity and was based primarily on the testimony of Dr. Wilinsky; that, although the court did not summarize Dr. Wilinsky's conclusions, neither did it summarize the conclusions of the government's psychiatrist-witness; that the court expressed no opinion on the issue of insanity; that the proof of guilt was strong; that the court carefully instructed the jury as to their being the sole judges of the facts and that no language used by the court in its instructions or during trial was to be considered as meaning that the court entertained any opinion on the facts; and that, taking the instructions as a whole, there was no prejudicial error.

■ A trial judge's comments on the evidence are often urged as an issue on appeal. A federal judge, of course, may comment upon the evidence in a criminal case and draw the attention of the jury to the parts of it which he deems to be important. If the court undertakes to review the facts it must do so in fairness to both sides. This court has spoken freely on this subject and there is no real quarrel here with these principles. See Franano v. United States, 310 F.2d 533, 537–538 (8 Cir. 1962), cert. denied 373 U.S. 940, 83 S.Ct. 1545, 10 L.Ed.2d

694, and cases cited; National Dairy Prod. Corp. v. United States, 350 F.2d 321, 333–334 (8 Cir. 1965), vacated on other grounds, 384 U.S. 883, 86 S.Ct. 1913, 16 L.Ed.2d 995; Fowler v. United States, 352 F.2d 100, 109–110 (8 Cir. 1965), cert. denied 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663; Rowell v. United States, 368 F.2d 957, 960–961 (8 Cir. 1966), cert. denied 386 U.S. 1009, 87 S. Ct. 1353, 18 L.Ed.2d 438.

■ We have read the court's instructions carefully and in their entirety. While we understand the defense's concern about the court's statement that the defendant "pulled the trigger and wielded the paring knife as he plunged it into Gregory's heart", and counsel's feeling of obligation to bring this to our attention on appeal, we do not conclude that this alone constituted prejudicial error or that the court unfairly summarized the evidence. In any event, particular caution will be exercised in this area on the new trial.

G. Addendum. We are aware that our reversal and remand for a new trial could lead to an additional problem. On a record which, we have concluded, contains prejudicial error, the defendant, although convicted, received qualified verdicts and a life sentence on each count. He thus escaped the death penalty which otherwise is the prescribed punishment under § 1111(b). Is this defendant, as a part of the price he pays for his right to appeal, now required on his new trial again to run the risk of capital punishment, or do constitutional or other considerations limit his maximum risk on the new trial to life sentences?

The older cases point in the direction of the first alternative. Trono v. United States, 199 U.S. 521, 533, 26 S.Ct. 121, 50 L.Ed. 292 (1905); Stroud v. United States, 251 U.S. 15, 18, 40 S.Ct. 50, 64 L.Ed. 103 (1919); King v. United States, 69 App.D.C. 10, 98 F.2d 291, 295 (1938). See Stroud v. United States, 283 F.2d 137 (10 Cir. 1960), cert. denied 365 U.S. 864, 81 S.Ct. 834, 5 L.Ed.2d 826.

Green v. United States, supra, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), however, might cause one to wonder about the continuing efficacy of these earlier decisions. In Green the jury returned a verdict of guilty of second degree murder but was silent on the first degree murder charge. A sharply divided Supreme Court held that a second trial for first degree murder placed that defendant in double jeopardy and violated the Fifth Amendment. The majority brushed aside the government's waiver argument with the comments, pp. 192–193, 78 S.Ct. pp. 226–227, that it was fictional, that the defendant "had no meaningful choice", and that "faced with such a 'choice' [he] takes a 'desperate chance' in securing the reversal of the erroneous conviction". The Court, of course, was dealing with the factual situation of an appeal from a second degree murder conviction and retrial on a first degree murder charge. Compare Cichos v. Indiana, 385 U.S. 76, 87 S.Ct. 271, 17 L.Ed.2d 175 (1966). See Fay v. Noia, 372 U.S. 391, 396–397, note 3, 439–440, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); United States v. Tateo, 377 U.S. 463, 465, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); United States v. Ewell, 383 U.S. 116, 121, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966). In the present case, as in Stroud, we are confronted with an appeal from a first degree murder conviction but with life sentences imposed. Thus, Green is not precisely in point. Indeed, the Court in Green stated flatly that Stroud "is clearly distinguishable", p. 195, note 15, of 355 U.S., p. 236 of 78 S. Ct.; the dissent felt otherwise, p. 213 of 355 U.S., p. 227 of 78 S.Ct. We wonder, however, whether the rationale of Green and the Court's comments might not today have conceivable application to a jury verdict of the kind which is present here.

We note that recently there have appeared holdings and suggestions that punishment on the second trial may not exceed that imposed after the first.

Some of these are based upon constitutional double jeopardy, due process, or equal protection grounds. Others rest on a declared procedural policy which would prevent what is regarded as undue or unfair conditioning or limiting of the right of appeal. See, for example, People v. Henderson, 60 Cal.2d 482, 35 Cal. Rptr. 77, 386 P.2d 677, 685–686 (1963), where it was said, "A defendant's right to appeal from an erroneous judgment is unreasonably impaired when he is required to risk his life to invoke that right"; State v. Wolf, 46 N.J. 301, 216 A.2d 586, 590, 12 A.L.R.3d 970 (1966), where the court said, "since the State has granted the universal right of appeal, standards of procedural fairness forbid limiting the right by requiring the defendant to barter with his life for the opportunity of exercising it"; State v. Turner, Or., 429 P.2d 565 (1967), with its general discussion and cases cited; People v. Ali, 57 Cal.Rptr. 348, 424 P.2d 932, 935 (1967); Marano v. United States, 374 F.2d 583 (1 Cir. 1967); United States ex rel. Hetenyi v. Wilkins, 348 F.2d 844 (2 Cir. 1965), cert. denied 383 U.S. 913, 86 S.Ct. 896, 15 L.Ed.2d 667; Patton v. State of North Carolina, 256 F.Supp. 225, 235–237 (W.D.N.C.1966); Gainey v. Turner, 266 F.Supp. 95 (E.D.N.C.1967); Holland v. Boles, 269 F.Supp. 221 (N.D.W. Va.1967); Gray v. Hocker, 268 F.Supp. 1004 (D.Nev.1967). Compare, however, United States ex rel. Starner v. Russell, 378 F.2d 808 (3 Cir. 1967), reversing 260 F.Supp. 265 (M.D.Pa.1966); Shear v. Boles, 263 F.Supp. 855 (N.D.W.Va. 1967); State v. Pearce, 268 N.C. 707, 151 S.E.2d 571 (1966).

We mention these several cases and the fascinating issue they pose only so that the United States attorney and the trial court will have this possible additional legal issue in mind on the second trial and, perhaps, with careful guidance of that trial, may avoid it.

Reversed and remanded for a new trial.